**CENTRAL VALLEY WATER AGEN-CY, South Delta Water Agency, Alexander Hildebrand, R.C. Farms, Inc., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

No. CV.F–99–5650 OWW DLB.

United States District Court, E.D. California.

May 26, 2004.

Order Entering Judgment June 24, 2004.

Dante John Nomellini Jr, Nomellini Grilli and McDaniel, Stockton, CA, for Central Delta Water Agency, R C Farms, Inc.

Dante John Nomellini Jr, Nomellini Grilli and McDaniel, John Herrick, Law Office of John Herrick, Stockton, CA, Thomas M. Zuckerman, Law Office of Thomas M Zuckerman, Acampo, CA, for South Delta Water Agency, Alexander Hildebrand.

Jeanne M Zolezzi, Herum Crabtree Brown, Stockton, CA, for Stockton East Water Dist.

Cynthia L Koehler, Environmental Defense Fund, Oakland, CA, Save San Francisco Bay Ass'n, Natural Resources Defense Council, Environmental Defense Fund, Bay Institute of San Francisco, Pacific Coast Federation of Fishermens Ass'ns, United Angles of California.

Maria A Iizuka, United States Department of Justice, Environment and Natural Resources Div, Sacramento, CA, for Bureau of Reclamation, Bruce Babbitt.

Sara J Russell, Attorney General's Office for the State of California, Sacramento, CA, for Dept. of Fish and Game, State of Cal., Robert C. Hight.

Michael Victor Sexton, Minasian Spruance Meith Soares and Sexton, Oroville, CA, Arthur F Godwin, Griffith and Masuda, Turlock, CA, Tim O'Laughlin, O'Laughlin and Paris LLP, Chico, CA, for San Joaquin River Group Authority, Oakdale Irrigation, South San Joaquin Irriga-

tion Dist., Turlock Irrigation Dist., Merced Irrigation Dist., Modesto Irrigation Dist. San Joaquin River Exchange Contractors Water Authority.

MEMORANDUM DECISION AND OR-DER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [FED. R. CIV. P. 56]

WANGER, District Judge.

## I. *INTRODUCTION*

Central Delta Water Agency, South Delta Water Agency, Alexander Hildebrand, and R.C. Farms, Inc. ("Plaintiffs") move for summary judgement pursuant to Fed. R.Civ.P. 56 against the United States of America, et al. ("Federal Defendants") and San Joaquin River Group Authority, et al. ("Intervenors"). Defendants move for summary judgment against Plaintiffs claiming the court should abstain from hearing Plaintiffs' claims. At issue in this case is whether Defendants have violated the terms of the Central Valley Project Improvement Act ("CVPIA") by improperly allocating water under CVPIA § 3406(b)(1–3), thereby causing Plaintiffs' irrigation water to become excessively salinated.

## II. *BACKGROUND*

This lawsuit is brought by four Plaintiffs, two water agencies chartered by the State of California and two private parties. Central Delta Water Authority ("Central Delta") and South Delta Water Authority ("South Delta") are water agencies created by the legislature in 1973 to ensure that the lands within their respective jurisdiction (i.e., within the Delta area) have a dependable water supply of suitable quality sufficient to meet present and future needs. The charters of the two agencies allow them to commence litigation to further their goals. *See* Cal. Water Code App. §§ 116–4.2(b), 117–4.3(b).

The two private parties are both farmers. R.C. Farms, Inc., owns farmland within Central Delta's service area, riparian to the channels of the Delta, and "had a permitted license from the State Water Resources Control Board to divert water from the San Joaquin River." Doc. 191, Federal Defendants' Statement of Undisputed Facts at 11, ¶ 53, filed October 31, 2003. Alexander Hildebrand owns approximately 150 acres of land adjacent and riparian to the San Joaquin River, in the South Delta service area. Hildebrand also claims to own various appropriative rights to divert water from the Central Valley Project ("CVP") waterways. Plaintiffs sued the United States Bureau of Reclamation ("Bureau") for declaratory relief and two other water agencies intervened. The two individual, private parties contend that the Bureau's current method of operating the New Melones Unit is highly likely to cause the salinity of the water in the Stanislaus River to exceed the Vernalis Standard at various times. Because they use that water to irrigate their crops, Plaintiffs contend that their ability to grow those crops will be severely hampered by the excessively salinated water.

The CVP is the largest federal water management project in the United States. Originally authorized by the Rivers and Harbors Act of 1935, the project consists of 20 dams and reservoirs, 8 powerplants, and approximately 500 miles of major canals and aqueducts. The Project is located in the Central Valley Basin in California, which is roughly 400 miles long by 120 miles wide and includes the major watersheds of the Sacramento and San Joaquin River systems. The two rivers meet at the Sacramento–San Joaquin Delta ("Delta"), where the waters mix and then flow through the Carquinez Strait into San Francisco Bay and, ultimately, into the Pacific Ocean. CVP water is used for agricultural, municipal, industrial, power

generation, and environmental protection purposes. The Central Valley is the heart of California's renowned farm country, and the Project provides the water that is essential to its unparalleled productivity. In any given year, the CVP manages water sufficient to irrigate one-third of all agricultural land in California.

The Project is operated by the Bureau, a division of the Department of the Interior ("Interior"). Pursuant to permits granted by the California State Water Resources Control Board ("Board"), the Project appropriates water from various mountain sources, and delivers it for beneficial uses to Central California areas. At issue in this case is the Bureau's operation of the New Melones Unit, one of the many water management units that constitute the Central Valley Project. The New Melones Unit consists of the New Melones Dam on the San Joaquin River. The dam diverts water in the New Melones Reservoir.

The Bureau operates the New Melones Unit pursuant to federal reclamation statutes as well as under four California water rights permits numbered 16597–16600, which were issued by the Board in water-rights decision 1422 ("D–1422"), rendered in April 1973. The permits allow for various uses of the water stored in the reservoir, including power generation, consumptive use in certain counties, and the preservation of fish and wildlife. D–1422 authorizes the Bureau to release certain amounts of water from the Reservoir to maintain local fishery populations so long as the salinity concentrations as measured downstream remain no greater than 500 parts-per-million (ppm). The gauging station where salinity levels are measured is located just below the confluence of the San Joaquin and Sacramento Rivers, at Vernalis, causing the salinity standard to be called the "Vernalis Standard." Water that is used for fishery habitats is not released into the Stanislaus River. Plain-

tiffs contend that the less water the Bureau releases into the Stanislaus River, the higher the salinity level downstream at Vernalis, which is closer to the ocean. According to the Plaintiffs, water that exceeds the Vernalis Salinity Standard—that is, water that measures in excess of 500 ppm at Vernalis—has a significant negative effect on certain types of crops, and the Bureau's compliance with the Standard determines what kind of crops they are able to grow.

The permits to operate the New Melones Project have been modified over the years in various ways, reflecting the intense competing demands for that Reservoir's waters. Most relevant to this case, in 1995 the Board issued a new Bay Delta Water Quality Plan ("Bay–Delta Plan"), which included general objectives for the water quality of the Central Valley Project waters. These objectives were agreed to by the state and federal governments, urban, agricultural, and environmental interest groups. The Board issued water rights decision WR–95–6, which resolved some relatively minor inconsistencies between existing permits and the requirements of the Bay–Delta Plan. The new plan, *inter alia:* 1) changed the unit of measurement for the salinity reading at Vernalis from a ppm standard for total dissolved solids to an electrical conductivity measure; 2) established a lower salinity standard for the April–August peak irrigation season, and a correspondingly higher standard for the other months. The Vernalis Salinity Standard was changed.

In 1992, Congress enacted the Central Valley Project Improvement Act ("CVPIA") as Title XXXIV of the Reclamation Projects Authorization and Adjustment Act of 1992, Pub.L. 102–575, 106 Stat. 4600, 4706–31 (1992). The law took effect on October 31, 1992. The Act followed significant lobbying efforts by envi-

ronmental groups to increase the amount of water from the CVP devoted to environmental purposes. The CVPIA consists primarily of provisions designed to ensure that the CVP is managed to further the protection and restoration of the natural environment. *See* §§ 3402, 3406. The Act provides generally that the CVP shall be operated in accordance with all obligations under state and federal law, and specifically requires compliance with decisions of the Board that impose conditions on applicable licenses and permits governing the project. *Id.* Three specific provisions of the statute relate to requirements that the CVP divert water to flood fishery areas to enhance the habitats of various aquatic life forms. Section 3406(b)(1) requires that the Bureau:

> [D]evelop within three years of enactment and implement a program which makes all reasonable efforts to ensure that, by the year 2002, natural production of anadromous fish in Central Valley rivers and streams will be sustainable, on a long-term basis, at levels not less than twice the average levels attained during the period of 1967–1991.

To implement this goal, § 3406(b)(2) specifies that the Bureau is required to manage 800,000 acre-feet ("AF") of Project waters "for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title." Section 3406(b)(2) also states that in calculating CVP yield to devote to the fish-doubling goal, the Bureau must comply with "flow and operations requirements imposed by terms and conditions existing in license, permits, and other agreements pertaining to the Central Valley Project under applicable State or Federal law existing at the time of enactment of this title ...." Section 3406(b)(3) authorizes the Bureau to "develop and implement a program in coordination and in conformance with the plan required under [§ 3406(b)(1) ] for the ac-

quisition of a water supply to supplement the quantity of water dedicated to fish and wildlife purposes under [§ 3406(b)(2) ]." The Act requires Interior to implement a fish doubling and habitat protection program, in accordance with applicable state water use permits.

Soon after the CVPIA's passage, the Bureau adjusted its operations to comply with CVPIA requirements. The Bureau began diverting water for use in fish habitats that otherwise would have been released from the New Melones Reservoir into the Stanislaus and San Joaquin Rivers. Nothing in the Act requires the Bureau to take water from the New Melones Reservoir, as opposed to the many other Central Valley Project reservoirs, to comply with the fish habitat restoration requirements of § 3406(b). Nevertheless, as part of its efforts to meet (b)(2) requirements, the Bureau exercised its discretion to divert water from New Melones. In 1999, the Bureau adopted the New Melones Interim Operations Plan ("Interim Plan"), which provided for the release of water from the New Melones Reservoir in April, May, and October to supplement fishery flows in the Delta and for the purchase of water from other users for the same purpose. Originally intended to be in place for only two years, the Interim Plan has continued in effect for more than five years through the present.

### III. *PROCEDURAL HISTORY*

This case was filed in May 1999, after the Bureau adopted the Interim Plan and began releasing water from New Melones in order to comply with §§ 3406(b)(1–2) of the Act. The Plaintiffs sought a temporary restraining order to prevent the release of such water unless the Bureau reserved an amount of water sufficient to meet the Vernalis Standard (i.e., water that does not

exceed 500 ppm at Vernalis).[1] After a hearing, the Plaintiffs withdrew their motion.

The parties filed cross-motions for summary judgment and, after oral arguments, the District Court granted Defendants' motion with respect to all Plaintiffs' claims except for those of Stockton East Water District ("SEWD") under its interim CVP water service contract, ruling: 1) "none of the Plaintiffs have standing to challenge the Bureau's release of water from New Melones," and that 2) "previous administrative and judicial proceedings regarding the management of the New Melones Unit barred this action on the grounds of claim and issue preclusion." The District Court certified the decision for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). In *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 946, 951–52 (9th Cir. 2002), the Ninth Circuit reversed the decision on the issues of standing and claim and issue preclusion and remanded the matter in a 2–1 decision.[2] On this issue of standing, the Ninth Circuit found that "the risk of harm to [farmer] Plaintiffs' crops created by the Bureau's water management procedures ... [wa]s sufficient to afford Plaintiffs standing." *Id.* at 950. The two agencies had "associational stand-ing" because the "individual plaintiffs ha[d] standing[,] ... the two state agencies seek to protect interests germane to their purposes[,] ... [and] the individual landowners within the agencies' jurisdictions (other than the individual Plaintiffs) need [not] be parties to this case." *Id.* at 951. The Ninth Circuit also found that claim preclusion did not bar Plaintiffs' claim because "the prior litigation [did not] involve[ ] the same claim or cause of action as [this suit]" and that issue preclusion was not a bar because "[t]he two actions [were] not 'identical.'" *Id.* at 952, 953.

The United States of America, et al., ("Federal Defendants") moved for summary judgment against Central Delta Water Agency, et al., ("Plaintiffs"). Doc. 189, Federal Defendants' Motion ("Federal Defendants' Motion"), filed October 31, 2003.

Plaintiffs cross-moved for summary judgment against Federal Defendants. Doc. 193, Plaintiffs' Motion for Summary Judgment Against All Defendants ("Plaintiff's Motion"), filed November 3, 2003; Doc 194, ("Plaintiffs' Memo"), filed November 3, 2003. Plaintiffs submitted a statement of undisputed facts and four declarations in support of their motion. Docs. 195–99. Federal Defendants op-

---

1. Under its 1995 Water Quality Control Plan, SWRCB changed the 500 ppm TDS standard to 0.7 mmhos/cm electrical conductivity (EC) for April through August and 1.0 mmhos/cm EC for September through March.

2. In his dissent, Judge Fernandez observed:
 Central Delta has no right whatsoever to require that a certain amount of water be kept behind the New Melones Dam; likewise, it has no right to the water stored in that dam during the period of storage. It only has a right to have sufficient water supplied to maintain water quality downstream. That right has not been violated, and the government has no intention of violating it. Thus, this case is not at all like cases where some sort of wrongdoing has endangered the existing rights of a par-ty.... [T]he government has indicated that it will do whatever is required to keep the water at the proper level of quality. It will even acquire water elsewhere, if that becomes necessary. Thus, Central Delta's speculation that under some conditions at some later time the government may breach its legal duty to supply water is entirely insufficient to show that "invasion of a legally protected interest" is more than "'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citation omitted). Central Delta simply cannot prove that "the irreducible constitutional minimum of standing" exists. *Id.*
 *Cent. Delta*, 306 F.3d at 954.

posed November 26, 2003. Doc. 201. Plaintiffs replied December 1, 2003. Doc. 202. Plaintiffs filed opposition to Federal Defendants' motion for summary judgment and submitted a declaration to support their opposition. Docs. 203 and 204, filed December 1, 2003.

The San Joaquin River Group Authority ("Intervenors") submitted opposition to the Plaintiffs' motion, its own statement of undisputed facts, and a declaration in support of its opposition. Docs. 205–07, filed December 4, 2003. Federal Defendants replied to opposition to its motion for summary judgment. Doc. 208, filed December 12, 2003. Plaintiffs replied to opposition to their cross-motion for summary judgment. Doc. 209, Plaintiffs' Joint Reply to Opposition to Motion for Summary Judgment, filed December 15, 2003.

Oral arguments were heard January 12, 2004.

## IV. STATEMENT OF FACTS

### A. Statements of Undisputed Facts

1. Statement of Undisputed Facts for Defendants' Motion for Summary Judgement

1. The Bureau of Reclamation ("Bureau") operates New Melones Reservoir, part of the Central Valley Project (CVP).

2. The CVP is operated by the Bureau pursuant to federal reclamation law and water rights permits and licenses issued by the State Water Resources Control Board (SWRCB).

3. New Melones Reservoir is located on the Stanislaus River and has a capacity of approximately 2.4 million acre feet.

5. In 1987, Reclamation executed an agreement with the California Department of Fish & Game which requires Reclamation to release annually from New Melones between 98,000 acre feet and 302,600 acre feet for fishery purposes.

8. Central San Joaquin Water Conservation District has a contract with Reclamation for a supply of water from New Melones. Stockton East Water District ("SEWD") has a contract for an interim supply of water from New Melones.[3]

9. The SWRCB issued Bureau's initial permits for New Melones in 1973 pursuant to Water Right Decision D–1422.

10. Among the conditions in the D–1422 permits were that Bureau provide releases for the two senior water rights holders, South San Joaquin Irrigation District and Oakdale Irrigation District; meet fishery needs; and provide for the dilution of salinity.

12. A number of protests were filed to D–1485. See United States v. State Water Resources Control Board, 182 Cal.App.3d 82, 227 Cal.Rptr. 161 (1986) ("Racanelli Opinion").

13. Among the protesters were the Delta riparians (including Central Delta and Hildebrand) who alleged that the SWRCB's actions in issuing D–1485 were inadequate in failing to provide more stringent water quality standards to protect their existing rights to use Delta waters against excess salinity.

14. Judge Racanelli stated that "[t]he Delta riparians contend they are entitled to the free use of water flowing by their land …." 182 Cal.App.3d at 112, 227 Cal. Rptr. 161 (emphasis added).

15. Judge Racanelli held: "Riparians have no rights to a specific amount of water. Rather, they enjoy as an incident of common ownership with other riparians on the stream a correlative share in the natural flow. (Emphasis added). Thus, in times of water shortage, all riparians must

---

**3.** Stockton East is entitled to receive water under the contract when water is available.

curtail their usage in order that they share the available water. Similarly, all riparians must curtail their usage in order that they share the available water." 182 Cal. App.3d at 104, 227 Cal.Rptr. 161.

19. In October, 1992, Congress enacted the Central Valley Project Improvement Act (CVPIA). Under § 3406(b)(2) of the CVPIA, the Secretary of the Interior was directed to dedicate and manage 800,000 acre-feet of CVP yield to be used for fisheries and wildlife purposes.

20. "For the purpose of this section, the term 'Central Valley Project yield' means the delivery capability of the Central Valley Project during the 1928–1934 drought period after fishery, water quality and other flow and operational requirements imposed by terms and conditions existing in licenses, permits and other agreements pertaining to the Central Valley Project under applicable State or Federal law existing at the time of enactment of this title have been met." Section 3406(b)(2) of the CVPIA.

22. The pulse flow objective required significantly higher water flows at Vernalis for a one month period (approximately April 15—May 15).

23. On March 6, 1995, the United States Fish & Wildlife Service (FWS) issued a biological opinion (BO) which addressed the impact of Bureau's CVP operations on the Delta smelt. The BO required a spring (April 15—May 15) pulse flow at Vernalis to ensure the movement of the smelt past the export pumps in the southern Delta.

24. The March 6, 1995, BO required flow at Vernalis in the February through June period to contribute to compliance with the "X2" standard for Delta outflow.

27. Several parties, including these Plaintiffs, petitioned the SWRCB for reconsideration of WR 95–6. The petitions were denied by WR 95–14.

28. In addressing Plaintiffs' claims that Reclamation was violating the terms of its permits, the SWRCB found:

Among other beneficial uses, the USBR's New Melones permits authorize appropriation of water for fish and wildlife preservation and enhancement uses. During the time since the New Melones permits were approved under Water Rights Decision 1422 in 1973, the USBR's water right permits have not limited the amount of water the USBR can release for fishery protection without violating its water rights permits. Order WR 95–6 did not change this. Consequently, the USBR can release as much water as is necessary for fishery protection without violating its water rights permits. (Emphasis added).

30. The Interim Plan established criteria for sharing the water supply and is based upon forecasted inflow to New Melones and carryover storage.

31. The San Joaquin River Agreement (SJRA), finalized in January 1999, uses the New Melones Interim Operations Plan as the base assumption for the Stanislaus River and contemplates that the Interim Operations Plan for New Melones will be modified.

33. In Decision 1641, 1999 WL 149883 at *55 (Dec. 29, 1999), the SWRCB found:

A key issue of Phase 5 of the Bay–Delta Water Rights Hearing was how to allocate responsibility for meeting the southern Delta salinity objectives. The 1995 Bay–Delta Plan contains salinity objectives for the San Joaquin River at Vernalis and for three locations within the southern Delta ... to protect agricultural beneficial uses of water in the southern Delta .... The USBR is required, under its New Melones permits issued pursuant to D–1422 and D–1616, to meet the salinity objective at Vernalis .... The USBR historically has met its

responsibility for salinity control in the Delta by releasing water from New Melones Reservoir as required under D–1422 .... Currently, Order WR 98–09 requires the USBR to meet instead the Vernalis salinity objective in the 1995 Bay–Delta Plan. The SWRCB reserved jurisdiction over the permits for New Melones Reservoir for the purpose of revising the release requirements for water quality objectives.

34. In March 2000, the SWRCB issued Revised Water Right Decision 1641. In addressing actions to meet the Vernalis salinity objectives, the SWRCB found:

Some parties in the hearing suggested that the USBR should consider potential sources of dilution water other than New Melones Reservoir. The USBR presented testimony that it has acquired water from other parties for the purpose of meeting flow objectives on the San Joaquin River at Vernalis and has considered the use of water from the Delta–Mendota Canal to meet the water quality objectives. The USBR has not considered using water stored in Millerton Lake [Friant Unit] because it believes that conveyance losses due to percolation and uncontrolled diversions are in the order of 50 percent. Because other sources of water are available, the USBR has not made an effort to determine the actual conveyance losses that would occur if water is released from Friant for salinity control at Vernalis .... Westlands Water District (WWD) requested that the SWRCB not take any action that would affect its CVP deliveries. If the SWRCB were to amend the CVP water right permits to require compliance with the southern Delta salinity objectives using only dilution water, there could be adverse effects on the water supply of CVP contractors south of the Delta, including WWD. Revised Decision 1641, 1999 WL 1678482, *53–54.

36. "The USBR historically has met its responsibility for salinity control in the Delta by releasing water from New Melones Reservoir as required under D–1422." (Revised Decision D–1641, Introduction, Para. 10.1, *52).

37. "Riparian right holders cannot ... require that water stored in another season be released for their benefit. Water stored in another season is not natural flow of the stream. Riparian rights attach only to the natural flow of a stream. [Citations omitted]. Further, riparian rights do not attach to water that has been stored upstream during an earlier period. [Citation omitted]. Thus, if water previously stored in another season is flowing in the stream, that water is not available to riparian right holders." (Revised Decision D–1641, Introduction, Para. 6.3.2.1., *10).

Plaintiffs' Response: Undisputed as to accuracy of the quote. Disputed as to legal conclusion.

38. In 1999, these Plaintiffs filed this lawsuit alleging that Bureau has violated § 3406(b) of the CVPIA.

39. This Court found that Plaintiffs had "failed to demonstrate the existence of actual injury."

The Bureau's state water permits require that it schedule releases at New Melones Reservoir to maintain a certain water quality level at Vernalis. See Permit for Diversion and Use of Water, ¶ 19 .... Plaintiffs assert that the Bureau has determined how much water it will allocate to water quality purposes under its interim plan of operations at New Melones ... and that the Bureau's modeling based on that allocation shows that it will not meet the water quality requirements at Vernalis in 31 of 71 year types .... If the Bureau fails to maintain water quality, downstream users will be adversely affected.

However, Plaintiffs presented no evidence that the Bureau is currently violating, or has ever violated, the water permits. Rather, the evidence presented establishes only, at best, that the Bureau may not meet the requirements of its water permit at some future time. Under Plaintiffs' own analysis, it is more likely than not that the Bureau will not violate the water permits, i.e., in 40 of the 71 year types. Moreover, Plaintiffs' assertion that the water quality provision will be violated assumes that the Bureau will take no remedial action if, in fact, the Bureau ever fails to satisfy the requirements of its water permits. This is far from demonstrating "a very significant possibility that the future harm will ensue." Therefore, this alleged injury is too speculative to provide a basis for standing. (Emphasis added).

40. Plaintiff Alexander Hildebrand, in his deposition taken on May 27, 1999, testified that there had been no water quality problems in the previous four years.

> Q: The last four years you have indicated have been wet. Have you had water quality problems at any time during these last four years?
>
> A: None that I am aware of.
>
> (In the Matter of Bay–Delta Water Rights Hearing, SWRCB, Deposition of Alexander Hildebrand, May 27, 1999.)

41. In his most recent deposition, Mr. Hildebrand testified when asked whether there had been any water quality violations at Vernalis, focusing on agricultural beneficial uses:

> I don't recall whether there has been a violation during that period, but we are much aware of the fact that the interim operating plan would, by the Bureau's own analyses, not meet that requirement in many years over a period of time in July and August and that the violations could be substantial.

(June 17, 2003 Deposition of Alexander Hildebrand taken by SJRGA at Tr. 62).

42. Mr. Hildebrand testified at his June 17, 2003, deposition that he was unaware of any violations [of the Vernalis Standard]. (*Id.* at 63).

43. When asked by counsel for the Federal Defendants at the June 17, 2003, deposition how alleged violations of the Vernalis Standard were violations of the CVPIA, as alleged by Plaintiffs, Mr. Hildebrand testified: "I can't segregate between the CVPIA and just the CVP, but the CVP certainly is contributing to the problems we have in the South Delta in both quantity and quality of water levels." *Id.* at 79.

44. In a deposition taken in 1998, Mr. Hildebrand testified that the construction of Friant Dam was to blame for less water in the Delta. (Tr. 104–105, Bay–Delta Proceedings before the SWRCB, Deposition of Alex Hildebrand, June 25, 1998).

45. In discovery conducted after the remand from the Ninth Circuit, the Plaintiffs were served with the following document production request: "For each individual and/or group allegedly holding a water right cognizable under State law, provide all documents supporting such alleged water right."

48. McMullin Reclamation District No. 2075, San Joaquin Water Association and the San Joaquin River Water Users Company are not named Plaintiffs nor is there any indication that they are members of either CDWA or SDWA.

49. Mr. Hildebrand testified at his June 17, 2003, deposition at p. 92 that the San Joaquin River Water Users Company was a co-op.

51. Mr. Herrick, counsel for SDWA, stated at the deposition of Mr. Hildebrand on June 17, 2003, Tr. 71 that "the agency doesn't hold any license."

52. A witness for Plaintiff R.C. Farms was asked at his deposition on June 24, 2003, whether R.C. Farms had appropriative water rights. The witness responded: "Yes. We have riparian rights."

53. When asked whether R.C. Farms had a permitted license from the State Water Resources Control Board to divert water from the San Joaquin River, the witness testified that he was not sure.

54. In its decision, the Ninth Circuit panel stated: "There is little doubt that a court order could remedy any resulting injury to Plaintiffs by ordering the Bureau to select different means to comply with the Act, so that the proper salinity levels in the San Joaquin river are maintained."

55. This Court has held that "[t]he Bureau has discretion to prioritize and reprioritize releases and CVP water allocations to re-balance the overall CVP." *Westlands Water District v. U.S.*, 153 F.Supp.2d 1133, 1168–69 (E.D.Cal.2001), *aff'd*, 337 F.3d 1092 (9th Cir.2003).

58. Sensitive to the impacts on New Melones, the SWRCB in Revised Decision 1641 at 83 noted: "The USBR has not considered using water stored in Millerton Lake [Friant Unit] because it believes that conveyance losses due to percolation and uncontrolled diversions are in the order of 50 percent." The SWRCB, while acknowledging the views of Bureau, has directed Bureau to conduct studies proving the carriage losses if water from Friant, for example, were used.

2. *Statement of Undisputed Facts for Plaintiffs' Motion for Summary Judgement* [4]

1. Plaintiff Central Delta Water Agency (hereinafter "CDWA") is a political subdivision of the State of California created by the California Legislature for the following general purposes:

Sec. 4.1. The general purposes of the agency shall be to negotiate, enter into, execute, amend, administer, perform, and enforce one or more agreements with the United States and with the State of California, or with either, which have for their general purposes the following:

4. According to Local Rule 56–260 (Motions for Summary Judgement or Summary Adjudication), the opposition to the motion for summary judgment shall file "itemized fact in [a] Statement of Undisputed Facts." As section b of the rule says:

Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts which are undisputed and deny those which are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial. The opposing party may also file a concise "Statement of Disputed Facts," and the source thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication. The opposing party shall be responsible for the filing with the

Court of all evidentiary documents cited in the opposing papers. If a need for discovery is asserted as a basis for denial of the motion, the party opposing the motion shall provide a specification of the particular facts on which discovery is to be had or the issues on which discovery is necessary.

In this case, Federal Defendants, who oppose Plaintiffs' motion for summary judgment, did not "reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts which are undisputed and deny those which are disputed." Plaintiff's Answer to the Defendant's Amended Motion for Summary Judgment does not satisfy the requirements of Local Rule 56–260(b). Defendants–in–Intervention did reply to Plaintiffs' Statement of Undisputed Facts. This reply will be relied upon to construct the collective statement of undisputed facts. The other parties' non-compliance with these rules increases the burden on the court to identify what facts are truly undisputed and disputed.

(a) To protect the water supply of the lands within the agency against intrusion of ocean salinity; and

(b) To assure the lands within the agency a dependable supply of water of suitable quality sufficient to meet present and future needs.

The agency may also undertake activities to assist landowners and local districts within the agency in reclamation and flood control matters.

(California Stats.1973, c. 1133, p. 2321, § 4.1. Amended by Stats.1982, c. 1360, p. 5060, § 5; codified in California Water Code Appendix § 117–4.)

2. Plaintiff South Delta Water Agency (hereinafter "SDWA") is a political subdivision of the State of California created by the California Legislature for the following purposes:

Sec. 4.1. The general purposes of the agency shall be to negotiate, enter into, execute, amend, administer, perform, and enforce one or more agreements with the United States and with the State of California, or with either, which have for their general purposes the following:

(a) To protect the water supply of the lands within the agency against intrusion of ocean salinity; and

(b) To assure the lands within the agency a dependable supply of water of suitable quality sufficient to meet present and future needs.

The agency may also undertake activities to assist landowners and local districts within the agency in reclamation and flood control matters.

(California Stats.1973, c. 1089, p. 2211, § 4.1. Amended by Stats.1987, c. 667, § 3; codified in California Water Code Appendix § 116.41)

4. The land of R.C. Farms, Inc., is within the Central Delta Water Agency. (Sharp Dec., p. 2, para. 3.)

10. Hildebrand also possesses appropriative rights to divert water or may be supplied with water pursuant to licenses # 7143 (application # 19950), # 7144 (application # 19194), # 9228 (application # 13715), # 7568 (application # 17948), and # 4912 (application # 5316). (Doc. 196, Hildebrand Dec., p. 2, para. 3.)

11. Hildebrand's land is within the South Delta Water Agency. (*Id.*, p. 2, para. 1.)

16. The Central Valley Project is a project of, and operated by, Defendant U.S. Bureau of Reclamation pursuant to various acts of Congress, including among others, the Rivers and Harbors Act of 1935 (49 Stat. 1028, 1038). (*Central Delta Water Agency v. United States*, 306 F.3d 938, 943 (9th Cir.2002).)

17. The CVP is operated pursuant to permits granted by California's State Water Resources Control Board. (*Id.*)

18. Under the provisions of the Flood Control Act of December 22, 1944, and October 23, 1962, the New Melones Unit, consisting of New Melones Dam and Reservoir on the Stanislaus River, as part of the CVP, was authorized and constructed. (58 Stat. 887; 76 Stats. 1173.)

19. The New Melones Unit is permitted by SWRCB, to store and divert water. The Bureau holds SWRCB permit numbers 16597, 16598, 16599 and 16600, originally granted by the SWRCB in SWRCB Water Right Decision 1422. ("D–1422", Req. For Jud. Not., Exh. "B", p. 1–2; Exh. "C", attachment following page 56.)

20. Permit numbers 16598 and 16599 are for the use of water for the generation of power only. Under the terms of the other two permits, consumptive use of water from the New Melones Unit is authorized only in the counties of Stanislaus, Calaveras, Tuolumne and San Joaquin. (Hildebrand Dec. Exh. "B", para. 3.)

21. D–1422 conditioned the Bureau's permits for New Melones on meeting the then existing water quality standard as measured at Vernalis of 500 parts per million of Total Dissolved Solids ("ppm" of "TDS"). (Req. For Jud. Not., Exh. "B," p. 30–31.)

22. The permits state the Bureau shall make "releases of conserved water from New Melones for water quality control purposes ... to maintain a mean monthly Total Dissolved Solids concentration in the San Joaquin River at Vernalis of 500 parts per million or less ..." (Hildebrand Dec., Exh. "B".)

23. The permits state: "In the event that the Water Quality Control Plan (interim) is amended or superceded, the foregoing water quality objectives shall be modified to conform to then current criteria." (*Id.*)

24. Subsequent to D–1422, the Board adopted its 1995 Water Quality Control Plan which changed the 500 TDS standard to 0.7 electrical conductivity (EC) during the period April through August and 1.0 EC for the period of September through March ("Vernalis Salinity Standard"). (Hildebrand Dec., p. 3, para. 6, Exh. "C".)

25. The SWRCB Temporary Orders WR 95–6 and WR 98–9 added the changes set forth in the preceding paragraph to the Bureau's New Melones permits. (Hildebrand Dec., p. 4, para. 7–8.) These changes were continued in SWRCB Decision 1641. (Declaration of John Herrick In Support of Motion for Summary Judgment served and filed herewith, para. 9.)

26. The Vernalis Water Quality standard was adopted for the purpose of protecting water quality for agricultural downstream water users. (Req. For Jud. Not., Exh. "B", p. 11–13, 31–32.)

27. A 1987 agreement between the Bureau and the California Department of Fish & Game ("DFG") requires the Bureau to release a minimum of 98,000 acre feet of water from New Melones Reservoir for fish and wildlife. (Hildebrand Dec., Exh. "D", p. 3, Art. II(A.).)

28. The Bureau has been allocating and releasing and threatens to continue to allocate and release water for the purposes described in Central Valley Project Improvement Act ("CVPIA") §§ 3406(b)(1) and (b)(2) from New Melones Reservoir to provide fishery flows. (*Id.*, p. 6–7; Herrick Dec., Exh. "A"; Bowling Dep., p. 101.)

32. The SWRCB Vernalis Salinity Standard is a condition existing in the permits and licenses at the time of enactment of the CVPIA. (Req. For Jud. Not., Exh. "B", p. 37.)

34. The Bureau has purchased and is making purchases of water on the Stanislaus River and on other tributaries to the San Joaquin River. (Hildebrand Dec., p. 9, para. 22; p. 10, para. 25.)

38. Interior's DOI Exhibit "4–H Corrected," attached as Exhibit "E" to the Hildebrand Dec. shows the Bureau's allocations of New Melones water for the years 1991 through 1997. (Hildebrand Dec., Exh. "E".)

39. The Bureau violated the SWRCB Vernalis Salinity Standard in 1992, 1993 and 1994. (Hildebrand Dec., p. 6, para. 15, and Exh. "G"; Herrick Dec., Exh. "A"; Bowling Dep., p. 22.)

B. *Statements of Disputed Facts*

1. *Facts from Defendants' Motion for Summary Judgment that Plaintiffs Dispute*

4. Reclamation must annually deliver 600,000 acre feet from New Melones to two senior water rights holders, South San Joaquin Irrigation District and Oakdale Irrigation District.

6. Reclamation must meet a water quality standard at Vernalis established by the SWRCB pursuant to its delegated authority under the Clean Water Act.

7. Between 80,000 and 175,000 acre feet annually is needed to meet the Vernalis Standard.

11. In 1978, the SWRCB issued D–1485, promulgating new Bay–Delta water quality standards. 500,000 to 1,000,000 additional acre feet annually was needed to comply with the new standards.

16. The so-called "Delta standards" were first formulated in November 1965 under D–1275. 182 Cal.App.3d at 109, 227 Cal.Rptr. 161.

17. Judge Racanelli held that the SWRCB had no obligation to set water quality standards so as to provide salinity control to the southern Delta riparians. 182 Cal.App.3d at 122, 227 Cal.Rptr. 161.

18. Term 91, adopted in D–1594, requires that water right permit holders not divert water under certain conditions, in particular, when the CVP and the State Water Project (SWP) are supplementing natural and abandoned flows with stored water. Term 91 is intended to prevent a permit holder's diversions from causing a violation of Delta water quality standards or forcing the two Projects to release even more stored water.

21. In December, 1994, various entities, including Federal and State agencies, entered into the Bay–Delta Accord. The major purpose of the Accord was to address issues of water quality standards for the Bay–Delta. Therefore, new Delta water quality standards, including a new salinity standard and a spring "pulse flow" requirement at Vernalis, were developed.

25. The SWRCB adopted a water quality control plan (1995 WQCP) requiring spring flows similar to those in the March BO, and implemented the 1995 WQCP through Water Rights Decisions 95–6 and 98–9.

26. The SWRCB, in June 1995, adopted Order WR 95–6 which approved, in part, petitions filed by Bureau and the California Department of Water Resources (DWR) for permit changes to reflect the implementation of new water quality standards during the pendency of State Board proceedings to allocate responsibility for those standards.

29. In 1996, the New Melones Interim Operations Plan was developed in an attempt to address the need for compliance with all of Bureau's legal obligations at New Melones as well as the need to address contractor demands.

32. For several years, the SWRCB has been conducting hearings "In the Matter of: Implementation of Water Quality Objectives for the San Francisco Bay/Sacramento–San Joaquin Delta Estuary."

35. The SWRCB, in addressing the obligations of Reclamation with regard to the Salinity Standard at Vernalis, stated:

[T]his order amends the CVP permits under which the USBR delivers water to the San Joaquin basin to require that the USBR meet the 1995 Bay–Delta Plan salinity objectives at Vernalis. The USBR has wide latitude in developing a program to achieve this result. The USBR should consider sources of dilution water other than New Melones Reservoir and other means of reducing the salinity concentration in the southern Delta. This decision conforms Condition 5 of D–1422 to the southern Delta salinity objectives in the 1995 Bay–Delta Plan and to the current Basin Plan.

If, in five years, modeling and planning studies indicate that salinity objectives will not be consistently achieved, the USBR shall report to the Chief of the Division of Water Rights all activities

that were taken in attempting to meet the objectives, including out-of-valley alternatives. *Id.,* *55.

This decision requires the USBR to meet the Vernalis objective using any measures available to it .... Although the salinity requirement is applicable to all SWP [State Water Project] and CVP water rights, it should not be construed as requiring that the SWP or the CVP must use water from a particular source if it has another way to meet the requirement. For example, including the salinity control requirement in the Friant permits should not be construed as directing the USBR to use Friant water. *Id.,* *58.

46. On September 24, 2003, counsel for the Federal Defendants reviewed the documents produced by Plaintiffs in response to the request noted above. The following documents were produced:

a. "Application for a Permit," filed by McMullin Reclamation District 2075, dated December 1926.

b. "Application for a Permit," filed by McMullin Reclamation District 2075, dated May 1950.

c. "Application for a Permit," filed by San Joaquin Water Association, dated January 1958.

d. "Application for a Permit," filed by Alexander and Barbara Hildebrand, dated January 1960.

e. "Application for a Permit," filed by Alfred and Florence Grossi, dated February 1961. (For a permit in Marin County.)

f. "License for Diversion" issued to McMullin Reclamation District No. 2075, dated May 1957.

g. "License for Diversion" issued to Alexander Hildebrand and Barbara Fitch Hildebrand, dated November 1962. (Permit 12419)

h. "License for Diversion" issued to Alexander Hildebrand and Barbara Fitch

Hildebrand, dated November 1962. (Permit 11452)

i. "License for Diversion" issued to San Joaquin Water Association, dated September 1965.

j. "License for Diversion" issued to San Joaquin River Water Users Company, dated July 1969.

47. The only appropriative licenses issued by the SWRCB or its predecessor were issued to Mr. Hildebrand, McMullin Reclamation District No. 2075, the San Joaquin Water Association and the San Joaquin River Water Users Company.

50. With regard to riparian rights, the only document produced by Plaintiffs was an "ownership report" for the lands of Plaintiff Hildebrand.

56. The former operations chief for the CVP, Lowell Ploss, provided a declaration at trial in which he testified that if water quality were given the number one priority among the obligations imposed on Reclamation under Federal and State law [which is what the majority in this case suggested should occur], "fishery flows would be less than the minimum in 16 of 71 years. No water would be delivered for CVP contractors, CVPIA instream flows or to help meet the Bay–Delta Water Quality Control Plan."

57. Lowell Ploss, the former chief of CVP operations, further testified that: For several reasons, Reclamation relies solely on New Melones to provide CVP water to meet flow-related requirements at Vernalis. First, New Melones is the CVP reservoir that can provide benefits to existing fisheries in the Stanislaus River, which ensures multiple uses for releases to Vernalis. It also is the closest CVP reservoir to Vernalis. Second, the New Melones permits are the only permits from the SWRCB that impose Vernalis requirements (i.e., the salinity and pulse flow re-

quirements). Third, releasing water from other CVP reservoirs for compliance at Vernalis has not been shown to be reasonable. Releasing water from Friant, for example, would create substantial losses of CVP water, due to seepage into the riverbed above the Mendota Pool. Releasing water from San Luis Reservoir through the Newman Waterway raises numerous fishery, structural and operational issues that impair the usefulness of this option.

2. *Facts from Plaintiffs' Motion for Summary Judgment that Defendants Dispute* [5]

3. R. C. Farms, Inc., is the owner of land riparian to the San Joaquin River on Lower Roberts Island, downstream of the confluence with Old River and upstream from the confluence with Middle River. (Declaration of Kurt Sharp In Support of Motion for Summary Judgment filed June 14, 2003, ("Sharp Dec."), p. 2, para. 2.; Declaration of Christopher H. Neudeck in Support of Motion for Summary Judgment ("Neudeck Dec."), para. 3.)

5. As an owner of riparian lands, R.C. Farms, Inc., is entitled to divert waters from the San Joaquin River system for reasonable beneficial uses upon those lands. (*Id.*, p. 2, para. 3.)

6. The months of special concern for R.C. Farms, Inc., on the San Joaquin River are April through August, the peak irrigation months, and water quality is of great interest to R.C. Farms, Inc., because it impacts the crops grown by R.C. Farms, Inc. (*Id.*, p. 2, para. 4.)

7. Higher salinity of the water at Vernalis typically means higher salinity in the R.C. Farms, Inc., irrigation water, which impacts crop production. (*Id.*, p. 2–3, para. 5–7.)

8. As salinity rises at Vernalis, particularly above the Vernalis Standard, there is

a corresponding negative effect on the irrigated crops grown by R.C. Farms, Inc. (*Id.*, p. 3, para. 7.)

9. Alexander Hildebrand is the owner of approximately 150 acres of land adjacent and riparian to the east bank of the San Joaquin River and devoted to agricultural use, and as the owner of such riparian lands, he is entitled to divert waters from the San Joaquin River system for reasonable beneficial uses upon those lands. (Declaration of Alexander Hildebrand In Support of Application for Temporary Restraining Order, filed May 7, 1999, "Hildebrand Dec.", p. 2, para. 2; Neudeck Dec., para. 5.).

12. The months of special concern on the San Joaquin River are April through August, the peak irrigation months. (*Id.*, p. 9, para. 21(b).)

13. At times the water quality at Vernalis has determined what crops Hildebrand can grow. (*Id.*, p. 9, para. 22.)

14. The number of crop varieties impacted and the magnitude of the impact rises rapidly as the salinity rises above the Vernalis Salinity Standard. (*Id.*, p. 12, para. 29.)

15. Any time the Vernalis Standard is exceeded, there is a corresponding negative effect on the irrigated crops grown by Hildebrand. (*Id.*, p. 12, para. 30.)

29. The releases for fish flows deplete the Reservoir's storage and reduce the supply available to meet the SWRCB Vernalis Salinity Standard. (Hildebrand Dec., p. 5, para. 12, p. 13, para. 32, Herrick Dec., Exh. "A"; Bowling Dep., p. 53–54.)

30. The failure of Interior to meet the SWRCB Vernalis Salinity Standard degrades the quality of water utilized by riparian diverters, including plaintiffs and their constituents, who are legal users of

**5.** *Supra* note 4.

water along the San Joaquin River below Vernalis and in other portions of the Sacramento–San Joaquin Delta. (*Id.,* p. 3, para. 5; 9, para. 22, p. 12, para. 30; Sharp Dec., p. 2–3, para. 5–7.)

31. The current allocation and release of New Melones water is not the dedication of CVP yield after meeting the "fishery, water quality, and other flow and operational requirements imposed by terms and conditions existing in licenses, permits, and other agreements pertaining to the Central Valley Project under applicable State or Federal Law existing at the time of the enactment" of the CVPIA on October 30, 1992. (*Id.,* p. 7, para. 18; p. 13, para. 31–32, p. 14, para. 35.)

33. The Bureau as the operator of the CVP has not made the allocation of water for the purpose of meeting the Vernalis Water Quality Standard, before allocating water for § 3406(b)(1) and (b)(2) purposes. (Hildebrand Dec., p. 7, para. 17–18; Herrick Dec., Exh. "A"; Bowling Dep., p. 48.)

35. The Bureau's purchases decrease summer flows in the year of the purchase and/or in subsequent years such that the amount of water budgeted for water quality in New Melones often times is not adequate for the Bureau to meet the water quality standards required by its permits. (*Id.,* p. 11, para. 27; Herrick Dec., Exh. "C", p. 112–113.)

36. The Bureau's own modeling indicates it will fail to meet its water quality responsibility in 52 percent of the years, without any contingency plan to cure the shortfall. (*Id.,* p. 8, para. 19.)

37. The Bureau has allocated water from New Melones for (b)(1) and (b)(2) purposes, and purchased water for (b)(3) purposes, without previously allocating the amount of water necessary to meet water quality standards. (*Id.,* p. 7, para. 17–18; Herrick Dec., Exh. "A"; Bowling Dep., p. 27–28.)

40. The Bureau's allocation for water quality purposes from New Melones is based upon how much remains after its allocation of water for (b)(1) and (b)(2) purposes. (Hildebrand Dec., p. 7, para. 18; Herrick Dec., Exh. "A"; Bowling Dep., p. 27–28.)

41. The Bureau's allocation and release of § 3406(b)(1), (b)(2) and (b)(3) water, results in the unavailability of water to meet the SWRCB Vernalis Salinity Standard, and the deterioration in water quality in the San Joaquin River at Vernalis and downstream. (*Id.,* p. 5, para. 11–12, p. 13, para. 32.)

42. Purchases of water from agencies or individuals on the tributaries of the San Joaquin River by the Bureau under the authority of the CVPIA § 3406(b)(3) have and will likely continue to result in the shift of flows in the tributaries and the San Joaquin River from the summer to the spring or fall. (Declaration of Alexander Hildebrand In Support of Motion for Summary Judgment, filed herewith ("Hildebrand Dec. 2003"), para. 5.)

43. Decreasing summer flows in the tributaries and the San Joaquin River decreases the dilution of the high salt concentrations in the San Joaquin River during summer months and thus requires greater releases from New Melones Reservoir in order to meet the Water Quality Objectives for Agricultural Beneficial Uses measured at Vernalis and three other locations in the southern Delta as specified in the 1995 Water Quality Control Plan. (*Id.,* para. 6.)

44. Increasing releases from New Melones Reservoir to make up for the shift in flows resulting from purchases on the tributaries on the San Joaquin River decreases the carryover storage in New Melones Reservoir which results in smaller allocations for water quality purposes from that reservoir in future years. (*Id.,* para. 7.)

45. Decreased tributary flows will result in higher salt concentrations entering the Delta in summer and other months during those times sufficient dilution water from New Melones is unavailable to provide similar dilution or when the Bureau chooses to release insufficient water from New Melones. (*Id.*, para. 8.)

46. Higher salt concentrations entering the Delta adversely affects agriculture and other beneficial uses of Delta water. (*Id.*, para. 9.)

47. Providing water for transfers from the tributaries to the San Joaquin River without .a corresponding decrease in the consumptive use of water by the sellers will result in less carryover storage in the reservoirs on those tributaries, and thus less water available for all users dependent on that supply. (*Id.*, para. 10.)

## IV. *Legal Standard*

### A. *Motion for Summary Judgement Pursuant to Fed.R.Civ.P. 56*

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir.1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material. *Id.* A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence must be viewed in a light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v.*

*West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir.2001), *amended by* 2001 WL 1490998 (9th Cir.2001). Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp.*, 68 F.3d at 1221. The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux*, 263 F.3d at 1076.

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

"In order to show that a genuine issue of material fact exists, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Rivera v. National Railroad Passenger Corp.,* 331 F.3d 1074, 1078 (9th Cir.2003) (quoting *Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505). If the moving party can meet his burden of production, the non-moving party "must produce evidence in response .... [H]e cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med., Inc.,* 343 F.3d 1107, 1112 (9th Cir.2003). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera,* 331 F.3d at 1078 (citing *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 922 (9th Cir.2001)).

The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment. *See U.S. ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505. A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to find genuine factual issues. *See Abdul–Jabbar v. G.M. Corp.,* 85 F.3d 407, 410 (9th Cir.1996).

### V. *Legal Analysis*

#### A. *Plaintiffs' Motion for Summary Judgment*

Plaintiffs offer two arguments to support their motion for summary judgment. Plaintiffs contend "interior is ignoring the requirement that it first meet pre-CVPIA obligations, and not making provision for sufficient water to meet its water quality obligations." Plaintiffs' Motion at 8:24–26. Plaintiffs argue that Interior is failing to satisfy its obligations under D–1422, which it is required to do by CVPIA 3406(b)(2).[6] Plaintiffs claim that:

[b]y its own admissions, in its implementation of the CVPIA, Interior is ignoring the requirement that it first meet pre-CVPIA obligations, and not making provision for sufficient water to meet its water quality obligations. Indeed it is a matter of simple arithmetic that the Bureau reduces the amount of water available for water quality in order to provide section 3406(b)(2) water.

Plaintiffs' Motion at 8:24–28. Plaintiffs also contend that Interior's "acquisition of (b)(3) water will increase the number of exceedances of the Vernalis Water Quality Standard ... contrary to the express direction [of] section 3406(b)." *Id.* at 4–6. Plaintiffs argue "that Interior's present allocations and releases of (b)(1), (b)(2) and

---

**6.** Under D–1422, the SWRCB placed conditions upon Interior's use of the New Melones Unit. Interior was required to meet the then existing water quality standard at Vernalis: 500 parts per million ("ppm") total dissolved solids ("TDS"). Under its 1995 Water Quality Control Plan, SWRCB changed the 500 ppm TDS standard to 0.7 mmhos/cm electrical conductivity (EC) for April through August and 1.0 mmhos/cm EC for September through March. This change was subsequently set forth in temporary orders WR 95–6 and 98–9 and D–1641. Plaintiffs' Motion at 3:13–16; 8:13–24. 0.7 EC is approximately 450 TDS, while 1.0 is approximately 600 TDS. Iizuka Declaration, Exh. 11 at 17:1–11. As a result, the change lowered the TDS standard for April through August and raised it for September through March. *Id.*

(b)(3) water, are contrary to law." Plaintiffs' Motion at 9:10–11.

Federal Defendants and Defendants–in–Intervention filed two separate oppositions. Federal Defendants acknowledge that they must operate New Melones Reservoir in compliance with previously existing SWRCB permit conditions, which include Vernalis Salinity Standards. Federal Defendants' Opposition at 4–8. Federal Defendants also acknowledge that "there is not enough water in the Stanislaus River watershed during serious, prolonged droughts to fulfill the Vernalis Standard and all other SWRCB permit conditions, let alone provide water for project purposes." *Id.* at 5. Federal Defendants object, though, to Plaintiffs' contention that their New Melones Interim Plan of Operations (NMIPO) indicates a necessary future violation of the Vernalis Standard. *Id.* at 7:1–3.

Federal Defendants respond that Plaintiffs' reliance on a model, which depends on hypothetical future conditions, cannot provide a basis to infer that a future violation will occur. *Id.* at 7. As evidence, Federal Defendants offer their history of compliance, "even in the recent dry years." *Id.* at 8:8–9. Due to changes in hydrological conditions that occur on a continuing basis, Federal Defendants argue that they should be afforded substantial discretion to determine how best to allocate the water from New Melones and to satisfy all statutory requirements. *Id.* at 8–12. The language of 3406(b)(2) does not require, they argue, that any particular portion of the yield allocation be used to satisfy the Vernalis Standard. *Id.* at 12–15. Their (b)(3) water purchases do not prevent compliance with the Vernalis Standard, because: "since 1995, the year before the water transfers under (b)(3) began," no violation of the Vernalis Salinity Standard has occurred. *Id.* at 17:13–26. Finally, Plaintiffs' suit is a "collateral attack on the

findings of the SWRCB and should be rejected out of hand." *Id.* at 18:15–18.

Defendants–in–Intervention oppose Plaintiffs' summary judgment motion arguing that because Plaintiffs challenge the application of 3406(b)(3) and not the statute's validity, Plaintiffs must provide evidence of any alleged violations, which they have not done, and there is no showing how Defendants' actions have violated 3406(b)(3). Defendants–in–Intervention Opposition at 6:17–8:2. Defendants contend no factual questions remain since "Plaintiffs have admitted that no exceedances of the Vernalis Salinity Standard have occurred since 1995." *Id.* at 12:8–9. As current (b)(3) purchases are not the cause of any future violations of the Vernalis Standard, at best the possible occurrence of future violations is wholly speculative. *Id.* at 13:12–21:24. Defendants–in–Intervention also argue that Plaintiffs have not established the existence of a "nexus" between (b)(3) purchases and the Federal Defendants' ability to meet Vernalis requirements or the necessity for equitable relief. *Id.* at 22–26:17.

Plaintiffs submitted a joint reply to Defendants' two separate oppositions. Plaintiffs argue that Federal Defendants admit they do not have a plan to ensure Vernalis Salinity Standards are met and that the Ninth Circuit has indicated that the Defendants intention not to violate the standard is not necessarily sufficient to preclude Plaintiffs' action. Plaintiff's Reply 2–3. This ignores the actual operating regime of the CVP which has consistently met the Standard since 1994, and that Defendants literally manage the CVP on a day-to-day basis. "A finite plan" to address specifically, the exact water sources for Vernalis Standards' compliance, is neither practicable nor necessary, in view of the Bureau's constant adjustment and reallocation of CVP water throughout each water year.

Plaintiffs argue that Federal Defendants have no discretion in meeting Vernalis Standards because an agency only has discretion when the statute in question is ambiguous, and the CVPIA is not ambiguous. *Id.* at 3–4. This misapprehends that management of the CVP and implementation of the CVPIA have been expressly delegated by law (CVPIA) to Interior's discretion. Plaintiffs complain that Federal Defendants' (b)(3) purchase of "tributary flows that would otherwise flow in the San Joaquin do create a need for additional releases from New Melones, and sometimes worsen water quality ... [and will] increase the number of exceedances and the extent of exceedances of the Vernalis Standard." *Id.* at 5:9–16. Plaintiffs claim that "the modeled operation with (b)(3) purchases shows that it is only a matter of time before the government's (b)(3) purchases result in an increase in exceedances, and an increase in the severity of exceedances." *Id.* at 6:3–5. No exceedance has occurred since 1994. Finally, Plaintiffs deny that their action is a collateral attack on the State Board Phase 5 proceedings. *Id.* at 6:8–9.

Plaintiffs argue that Defendants–in–Intervention err in claiming that it "is a question of fact as to whether or not the purchases have resulted in water quality violations." *Id.* at 7:15–16. Plaintiffs admit that "there is no dispute that at the present time the (b)(3) purchases have not caused any water quality violations." *Id.* at 7:17–18. (Emphasis added.) According to the Plaintiffs, because of "[t]he good fortune of adequate rainfall ... there is [ ] no violation which could have been caused by the (b)(3) purchases." *Id.* at 19–20. To refute Federal Defendants' contention that

the Vernalis Salinity Standard has not yet been exceeded, Plaintiffs advance the argument: 1) "the failure to comply with the CVPIA requirement is immediate and it is the harm when the Vernalis Salinity Standard is violated which is delayed;" 2) focus upon the violation of the Vernalis Standard misses the present violation of the CVPIA. *Id.* at 7:28–8:2. Plaintiffs argue that "water quality exceedances will result" from Federal Defendants' (b)(3) purchases and this warrants injunctive relief. *Id.* at 10:12–13.

1. *Statutory Interpretation of 3406(b)(2)*

■ *Chevron* analysis first addresses "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. 2778.

■ Canons of statutory construction help give meaning to a statute's words.[7] We begin with the language of the statute. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 56, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) ("It is well settled that the starting point for interpreting a statute is the language of the statute itself.") (internal quotation marks and citation omitted); *Assoc. to Protect Hammersley, Eld & Totten Inlets v. Taylor Res., Inc.,* 299 F.3d 1007, 1015 (9th Cir.2002). "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common

---

7. " 'The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section ....' " *Westlands* *Water Dist. v. Natural Resources Defense Council,* 43 F.3d 457, 462 (9th Cir.1994) (quoting *Estate of Reynolds v. Martin,* 985 F.2d 470, 473 (9th Cir.1993)).

meaning." *U.S. v. Smith*, 155 F.3d 1051, 1057 (9th Cir.1998) (quoting *Perrin v. U.S.*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)); *U.S. v. Iverson*, 162 F.3d 1015, 1022 (9th Cir.1998).

█ "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)). If necessary to discern Congress's intent, we may read statutory terms in light of the purpose of the statute. Thus, the structure and purpose of a statute may also provide guidance in determining the plain meaning of its provisions. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."); *U.S. v. Lewis*, 67 F.3d 225, 228–29 (9th Cir.1995) ("Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme."). If, under these canons, or other traditional means of determining Congress's intentions, we are able to determine that Congress spoke clearly to preclude the Enhancement Project, then we may not defer to the USFWS's contrary interpretation. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 512, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("Where the language of the statute is clear, resort to the agency's interpretation is improper.").

Central to the parties' dispute is the meaning of § 3406(b)(2), and whether it affects the priority of water allotment for the Vernalis Standard:

Interior shall upon enactment of this title dedicate and manage annually eight hundred thousand acre-feet [800,000 AF] of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento–San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act. For the purpose of this section, the term "Central Valley Project yield" means the delivery capability of the Central Valley Project during the 1928–1934 drought period after fishery, water quality, and other flow and operational requirements imposed by terms and conditions existing in licenses, permits, and other agreements pertaining to the Central Valley Project under applicable State or Federal law existing at the time of enactment of this title have been met.

Plaintiffs emphasize the primacy of the word "after," which they contend refutes the Defendants' contention that "there is a hierarchy or priority of uses in the CVPIA." Plaintiffs' Reply at 4:3–4. Plaintiffs argue that the statute unambiguously requires the Secretary of the Interior to "manage" the 800,000 AF (CVP yield) only *"after fishery, water quality, and other flow and operational requirements imposed by terms and conditions existing in licenses, permits, and other agreements* pertaining to the Central Valley Project under applicable State of Federal law existing at the time of enactment of this title *have been met."* *Id.* at 4:8–14. (Plaintiffs' emphasis.) According to Plaintiffs, "when ... (b)(2) water is provided, it must be after providing for compliance with the pre-CVPIA requirements." *Id.* at

4:17–19. D–1422 (1973) established the Vernalis Salinity Standard, as amended through D–1641 (1999), through permits which "obligate the Bureau to make 'releases of conserved water from New Melones for water quality control purposes [i.e., salinity levels] ....'" Plaintiffs' Motion at 8:14–17. Plaintiffs argue that Defendants must "first meet [this] pre-CVPIA obligation[ ]" before employing (b)(2) for other purposes, as they are allegedly presently doing. *Id.* at 8:25. Plaintiffs advance the question whether the 1973 D–1422 agreement (as adjusted in 1999 under D–1641) with the state, imposes a prior obligation on the Bureau's New Melones' permits under 3406(b)(2) to refrain from (b)(2) releases until "after" the Vernalis Standard has been met.

Defendants contend that "the definition of what [3406(b)(2) ] means ... has been litigated [before the Ninth Circuit] and has been won by the United States." Iizuka's Declaration, Exh. 11 at 52:1–53:9. Defendants rely upon the Ninth Circuit's decision in *Bay Inst. of S.F. v. U.S.*, 66 Fed. Appx. 734 (9th Cir.2003), an unpublished opinion.[8] The Ninth Circuit held that 3406(b)(2)'s " 'primary purpose' ... is the implementation of 'fish, wildlife, and habitat restoration purposes authorized by this title ....'" *Id.* at 735. This question has been previously addressed in this court in extensive litigation over the CVPIA and the meaning and implementation of § 3406(b)(2). Defendants refer to the Ninth Circuit's holding that "[t]he non-mandatory language of the statute gives Interior discretion to allocate the 800,000 acre feet among fish and wildlife, water quality, and endangered species obligations, as long as Interior's allocation gives effect to the hierarchy of purposes established in Section 3406(b)(2)." *Id.* The CVPIA is unambiguous. Secondary to its primary purpose, fish, wildlife, and habitat restriction, the law seeks to assist the State of California with the protection of water quality in the Bay Delta and obligations under state or federal law passed after October 30, 1992, including but not limited to the ESA. Even if the Appellate Court's opinion is not relied upon as law of the case, it does persuasively suggest how the Ninth Circuit will address the issue in the future. Plaintiffs ignore other prior interpretations of the CVPIA in this court, in decisions where the meaning and implementation of the CVPIA and § 3406(b)(2) were at dispute among competing users as to the Bureau's annual CVP water allocation decisions.

 Plaintiffs fundamentally misunderstand the purposes of the CVPIA and

---

**8.** Circuit Rule 36–3. Citation of Unpublished Dispositions or Orders:

 (a) Not Precedent: Unpublished dispositions and orders of this Court are not binding precedent, except when relevant under the doctrine of law of the case, res judicata, or collateral estoppel.

 (b) Citation: Unpublished dispositions and orders of this Court may not be cited to or by the courts of this circuit except in the following circumstances.

 (i) They may be cited to this Court or to or by any other court in this circuit when relevant under the *doctrine of law of the case*, res judicata, or collateral estoppel.

 (ii) They may be cited to this Court or by any other courts in this circuit for factual purposes, such as to show double jeopardy, sanctionable conduct, notice, entitlement to attorneys' fees, or the existence of a related case.

 (iii) They may be cited to this Court in a request to publish a disposition or order made pursuant to Circuit Rule 36–4, or in a petition for panel rehearing or rehearing en banc, in order to demonstrate the existence of a conflict among opinions, dispositions, or orders.

 (c) Attach Copy: A copy of any cited unpublished disposition or order must be attached to the document in which it is cited, as an appendix.

U.S.C.S.Ct.App.9th Cir., Circuit R. 36–3 (2003) (emphasis added).

the operation of § 3406(b)(2). The Ninth Circuit in *Bay Institute* substantially affirmed the District Court's interpretation of the CVPIA and how water accounting should be implemented in annual dedication and management of 800,000 AF of CVPIA yield for (b)(2) purposes. Claim preclusion, or res judicata, applies where: (1) the same parties, or their privies, were involved in the prior litigation, (2) the prior litigation involved the same claim or cause of action as the later suit, and (3) the prior litigation was terminated by a final judgment on the merits. *Central Delta Water v. U.S.*, 306 F.3d 938, 952 (9th Cir.2002) (*citing Blonder–Tongue Laboratories v. University of Ill. Foundation*, 402 U.S. 313, 323–24, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)). Here, the first and second of the three requirements are not satisfied: the parties are different, although the current plaintiffs are similarly situated to the agricultural water users in *Bay Institute*, because they seek to limit Interior's discretion to annually dedicate and manage 800,000 AF of CVP yield. The claims in this case are different. Here, Plaintiffs seek to dictate how Interior should manage CVPIA yield to meet the Vernalis water quality standard. Claim preclusion is not applicable.

■ Issue preclusion, or collateral estoppel, is also inapplicable here, for essentially the same reasons. Issue preclusion applies when three conditions are met: (1) the issue in question must have been resolved by a judgment on the merits in a prior suit, (2) the second action must involve the same parties or their privies, and (3) the second action must be based on the same cause of action. *Central Delta*, 306 F.3d at 953 (citing *Jackson v. Hayakawa*, 605 F.2d 1121, 1126 (9th Cir.1979) (finding nonparties bound in privity because the earlier case was "treated by the court as a class action," though it was never certified as such)). In order for the third factor to be satisfied, the issues litigated must not be "merely similar," they must be "identical." *Central Delta*, 306 F.3d at 953 (citing *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1399 (9th Cir.1992)). In *Bay Inst.*, the Ninth Circuit found Interior has broad "discretion to specify what portion of the 800,000 acre feet of Project yield set aside in Section 3406(b)(2) may be used for water quality and Endangered Species purposes." *Bay Inst.*, 66 Fed.Appx. at 735. It found § 3406(b)(2)'s "primary purpose" was to implement the "fish, wildlife, and habitat restoration purposes authorized by this title . . . ." *Id.*

■ Plaintiffs, here, seek to limit the primary environmental restoration use of New Melones water to prefer their interest in protecting against a "possible" future noncompliance with the Vernalis Salinity Standard. That issue has not been previously litigated.

This dispute is easily resolvable by the clear language of the statute. Section 3406(b)(2) contains two different provisions which apply in the different contexts of *calculating* and *allocating* CVP yield. One provision defines and instructs Interior on how to quantify CVP yield. This provision was interpreted in *San Luis & Delta–Mendota Water Authority, et al. v. United States, et al.*, CIV–F–97–6140 OWW DLB, Doc. 320, filed March 13, 2000, regarding "Final Decision on Implementation of Section 3406(b)(2) of the Central Valley Project Improvement Act October 5, 1999" ("*Bay Institute*," on appeal, 238 F.3d 430 (9th Cir.2000)). CVP yield has been quantified by Interior in its Final Decision at 5,826,000 AF. The "after" language Plaintiffs seize on to justify their super-priority argument is not a term prescribing management or operations mandates to Interior. Rather, the CVPIA leaves to Interior's broad discretion and expertise the implementation of annual dedication and management of 800,00 AF

of CVP yield for (b)(2) purposes, which are:

1. the primary purpose of implementing fish, wildlife, and habitat restoration;

2. a secondary purpose of protecting "the waters of the San Francisco Bay/Sacramento–San Joaquin Delta Estuary;"

3. a tertiary purpose of meeting obligations imposed after CVPIA enactment by federal and state law, including the ESA.

*San Luis* focuses on different language in the provision that defines *how to calculate* CVPIA yield, which requires existing (10/31/92) water quality, license, and permit requirements, and other water project agreements, to be satisfied first. This is not an operational or management prescription, it is a quantitative method to define CVP yield. Congress froze in time the calculation of CVP yield to the period 1928–1934, knowing by the time the CVPIA was enacted in 1992, there was a huge controversy among competing users for CVP water and intending that a finite irreducible minimum of CVP water be annually available from the CVP for annual dedication and management for (b)(2) purposes. Plaintiffs contend that (b)(2) removes Interior's discretion to use the 800,000 AF of (b)(2) yield, before first satisfying the Vernalis Salinity Standard. This is a non issue. All parties agree the standard must be met. Interior, however, has the broadest discretion to decide how, i.e., the means, and when, during the water year, measures will be implemented to satisfy the Standard. Plaintiffs have no authority to compel the Agency's manner of implementation of the CVPIA.

Plaintiffs cite no authority to support their interpretation that the term "after" in 3406(b)(2) is an operational term. Defendants are correct that *Bay Institute* validates Interior's Final Decision defining the accounting calculation for CVP yield, as directed by the court. Plaintiffs' isolation of the word "after" does violence to the overall purpose and legislative intent that delegates to Interior the administrative agency discretion to annually dedicate and manage 800,000 AF of CVPIA yield for (b)(2) purposes. Interior has two-fold discretion that Plaintiffs fail to recognize. First, Interior must calculate "CVP yield" after meeting legal, license, permit, and contract requirements existing as of October 31, 1992, assuming hydrologic conditions of 1928–1934. Second, from this defined "yield," Interior has broad discretion to implement fish-restoration measures and to satisfy other (b)(2) purposes by such reasonable means as it chooses in annually allocating the 800,000 AF. The statute does not prescribe the Unit in the CVP from which Interior must take water to satisfy the Vernalis Standard. It does not say that Interior cannot use any CVP water, buy more non-CVP water, or use water from CVP units other than New Melones to satisfy the Standard. No CVP user, nor Plaintiffs, can direct how Interior must manage the CVP, day-to-day, year-in, year-out. *Bay Inst.* rejected water users' challenge that *after* Interior calculated CVP yield, that it was then required to operate the CVP as if assumed 1928–1934 conditions (severest California one hundred year drought) pertained during each post-October 31, 1992, water year.

Interpretation of specific statutory provisions necessarily requires an examination of the structure and history of a statute, as well as its purpose. *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1452 (9th Cir.1992). The Supreme Court has stated:

[I]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

The parties read the text of the statute differently. There is no language in the statute that limits the means the Bureau is able to use to meet its statutorily mandated CVP management obligations. The statute does not limit the Bureau's use of any CVP or (b)(3) water for (b)(2) purposes until "after" satisfying a hypothetical or projected need to satisfy threatened future failures to meet any pre-CVPIA water quality, license, permit, or other CVP contract requirements, which existed as of October 30, 1992. Such a reading would impair the Bureau's discretionary operation of the CVP in such a way that would prevent it from engaging in the complex water management regime that employs intricate computer models to evaluate the constantly changing water supply parameters that in turn drive day-to-day water allocation decisions the Bureau makes throughout each water year among the many water storage units which comprise the CVP.

Congress did not and could not speak to prescribe the exact relationship between these two sets of obligations, because it is impracticable to do so, due to the complex water management decisions the Bureau must make day-in-and-day-out in dedicating and managing the constant hydrologic flux of the CVP water supply to meet its statutory and contractual obligations. *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. Rather, Congress dedicated a finite annual supply of CVP water to be used for (b)(2) fish restoration and related environmental purposes, in the face of great controversy among the many constituents in the "water wars" over annual allocation of CVP water. Congress left to Interior the use of its considerable experience and expertise to implement all annual CVP water supply allocations. The statute recognizes compliance with pre-CVPIA obligations as a part of Interior's overall CVP management

responsibilities. Congress allowed Interior to determine how to balance and use the CVP's water resources and the means Interior employs to satisfy both CVPIA and pre-CVPIA obligations. In this lawsuit, a narrow constituency of water users seek to impose their will on the operation of the CVP. This does violence to the established principle of mandated judicial deference to agency administration in accomplishing its incredibly difficult statutory mission under the CVPIA.

The meaning of the language upon which Plaintiffs focus has also been litigated and settled through a court decision in an earlier CVPIA accounting case which "focus[ed] on the interpretation of the CVPIA term 'CVP yield.'" *San Luis & Delta–Mendota Water Authority, et al. v. United States, et al.*, CV–F–97–6140, Doc. 320, at 20:11–12; *see also* Doc. 466, at 27:9–29:8. In that case, the Plaintiffs argued "that Interior lacks discretion as to how [to] measure (b)(2) actions, and, consequently, all proposed (b)(2) actions must be modeled based on the 1928–34 hydrology." Doc. 320, at 19:21–24. The court found:

> CVP yield is defined to provide a reliable supply of CVP water for dedication and management annually for (b)(2) purposes. If Congress had intended that an historic firm yield methodology, no longer used by Interior, be used so that less than 800,000 AF of actual CVP water be dedicated and managed each year for (b)(2) purposes, it could easily have done so. Other provision of the CVPIA evidence Congress knew how to provide express protections for water users when it so intended.... [S]ections ... within the CVPIA that expressly protect contractors, militate against a finding that Congress' silence in (b)(2) expresses intent that a comparative measurement methodology be used that would significantly reduce 800,000 AF of the actual

amount of CVP water that could be devoted in most years to (b)(2) purposes.

The language of (b)(2) makes no reference as to how to measure the (b)(2) 800,000 AF annual dedication and use of CVP yield. CVP yield, as defined, is a reliable water supply, approximately 6 million AF of CVP water. Of this total supply, 800,000 AF are to be annually applied for (b)(2) purposes. How and for what (b)(2) purposes the water is to be used is committed to Interior's discretion.

This is a highly technical area requiring application of principles of civil engineering, hydrology, water management, fishery biology, and other environmental sciences. Congress' failure to specifically prescribe how to measure the amount of CVP yield used each year for (b)(2) purposes, cedes the interpretation and implementation of accounting for (b)(2) uses to the good faith discretion and expertise of Interior, its Bureau of Reclamation, and the U.S. Fish and Wildlife Service in consultation with California Department of Water Resources.

*Id.* at 23:4–24:26.

The issue of calculation of CVP yield and Interior's broad discretion to implement its use for (b)(2) purposes was exhaustively studied in the *San Luis and Delta Mendota (Bay Institute)* case, which concerned the competing rights *inter se*, among CVP water users, contractors, environmentalists, and power generators, resolving their dispute how CVP yield was to be calculated, accounted for, and annually dedicated and managed by Interior. Doc. 466 at 27:10–28:27. The definition of CVP yield raises an issue of statutory interpretation, i.e., one of law. The prior accounting decision made in this court, and in all but one respect affirmed on appeal, is instructive. The only ground on which the Court of Appeals disagreed with the District Court was in finding that

Interior's management discretion over the CVP to meet water quality and other environmental purposes is even broader than the district court recognized and was not to be limited.

The statutory language upon which Plaintiffs focus here pertains only to the definition of how CVP yield is calculated, located in only that part of the statute. The language does not describe an operational rule. The CVPIA, however, expressly recognizes that there will not be enough water for all statutory and contractual uses in some dry years. Section 3406(b)(2)(c) specifies that the annual dedication of 800,000 AF (b)(2) water can be reduced by up to one-fourth in drought years, further evidencing the breadth of Interior's discretion. The Bureau must comply with the law. It has done so. It says it will do so in the future. Section (b)(2) provides no authority to any water users to dictate how the Bureau must manage the CVP and one unit, the New Melones. As a result, *Chevron* deference is warranted.

### 2. *Chevron Deference*

In *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court set forth a two-step test for judicial review of administrative agency interpretations of federal law. Under the first step: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. Congressional intent may be determined by "traditional tools of statutory construction," and if a court using these tools ascertains that Congress had a clear intent on the question at issue, that intent must be given effect as law. *Id.* at 843 n. 9, 104 S.Ct.

2778; *see Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1164 (9th Cir.1999) (questions of congressional intent "are still firmly within the province of the courts under *Chevron* "). Conversely, at step two of *Chevron*, when applicable, courts recognize that if a statute is silent or ambiguous with respect to the issue at hand, then the reviewing court must defer to the agency so long as "the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In such a case an agency's interpretation of a statute will be upheld, unless "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778.

*Chevron* considered only formal notice-and-comment rule-making and did not state what other types of agency decisions should be given such deference. In *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), the Supreme Court clarified that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226–27, 121 S.Ct. 2164. "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." 533 U.S. at 227, 121 S.Ct. 2164. *Mead* also clarified the weight that a reviewing court should give to administrative decisions not meeting these standards. Quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the Court held that the deference to be accorded to such decisions depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Mead*, 533 U.S. at 228, 121 S.Ct. 2164 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161).

■ Under *Chevron's* first-step test, does the Bureau's discretionary Vernalis "Plan" offend the plain meaning and manifest congressional intent of the CVPIA? If so, Congress's intent must be enforced and that is the end of the matter. Conversely, if the statutory terms are ambiguous, then *Chevron* deference will only be given upon a conclusion that the Bureau's statutory interpretation has the "force of law." Otherwise, the Bureau's approach will receive respect if persuasive based on the factors recited in *Skidmore* and endorsed in *Mead*.

Federal Defendants argue that CVPIA language and the need to change water management conditions, sometimes on a daily basis throughout the water year, require that Interior should be afforded substantial discretion to determine how best to allocate New Melones Unit water and how to satisfy any applicable statutory requirements of the CVPIA. Federal Defendants' Opposition at 8–12. The language of 3406(b)(2) does not require that any particular portion of CVP yield allocation be used to satisfy the Vernalis Standard, so long as it is satisfied. *Id.* at 12–15. They contend that "the SWRCB has recognized that Reclamation has discretion on how to meet the standard." Defendants' Opposition at 18:10–11. As a result, *Chevron* deference applies to the means the Bureau chose and in the future will choose, to satisfy the requirements of the CVPIA. Defendants' Opposition at 8:25–9:18.

Plaintiffs do not address *Chevron;* they only argue that the Bureau lacks discretion because the statute is not "ambiguous." Plaintiffs' Reply at 3:23–5:4. Plain-

tiffs contend that "judicial deference" should not apply to the Bureau's implementation of the statute, because "[t]he mandate that existing requirements be fulfilled before the dedication of *any* of the 800,000 acre feet of water could not be more clear." *Id.* at 3:23–5:4, 4:15–16 (emphasis added.) Plaintiffs' argument ignores the administrative law principle that when the statute leaves to the agency the implementation of the statutory scheme, judicial deference is mandated. *Navajo Nation v. Dept. of HHS,* 285 F.3d 864, 872 (9th Cir.2002) (citing *Pauley v. BethEnergy Mines,* 501 U.S. 680, 696, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) ("When Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited.")); *Chevron,* 467 U.S. at 844–45, 104 S.Ct. 2778. The Vernalis Standard has not been violated.

Plaintiffs offer only allegations, not evidence that the Bureau's management of the CVP has caused them any harm or will in the future. By arguing that pre-CVPIA requirements must be "completely fulfilled" before "any" (b)(2) water can be dedicated to other purposes, Plaintiffs fail to distinguish between two different types of Bureau discretion. The Bureau acknowledges that it does not have the discretion whether to meet or not meet statutory pre-CVPIA obligations. The Bureau recognizes that it must do so and has engaged in rule making in its Final Decision on Implementation of Rule 3406(b)(2) to comply with the CVPIA. Interior correctly contends that it must have the discretion in each water year to choose the means by which to meet its CVPIA obligations. Such means cannot be dictated by the partisan interests of water users who compete with others for limited CVP water resources and here seek to impose their chosen management prescription on the government-operated CVP.

The Plaintiffs express their opinion: "During the last decade, the Bureau of Reclamation has repeatedly asserted that its Central Valley Project (CVP) water resources in New Melones Reservoir cannot satisfy all the permit requirements under all circumstances ... could not support all demands in certain dry conditions ... [therefore it is] impossible to provide water for all beneficial uses ...." Declaration of John Herrick (counsel for Plaintiffs) at 1. The "New Melones yield is insufficient to meet the conflicting project needs, a situation that predates the passage of the CVPIA" and can only be resolved through attempts "to balance the competing needs." Doc. 204, Declaration of John Herrick, Exh. D at 5. The issues of CVP capacity and water allocation priorities have been the subject of over twenty lawsuits in the Eastern District of California, seventeen of which have been venued in this court. Plaintiffs, whose claims have been rejected in State Water Board proceedings, have prosecuted this case without reference to and in disregard of federal and state administration and over ten years of judicial analysis concerning management of the CVP under conditions of ever-increasing demand for limited water resources.

Between 1992–97, the Bureau's methods of operation changed. The New Melones Interim Operation Plan ("NMIOP"), adopted in 1997, was devised to meet the various needs for annual uses of CVP water and to retain enough for the following year to guard against drought. Doc. 199, Herrick's Declaration, Exh. B at 42, filed November 3, 2003; Doc. 207, Declarations in Opposition to Plaintiff's Motion for Summary Judgment, Exh. 14, filed December 4, 2003. The NMIOP sought a reasonable balance between the many competing de-

mands for water on the Stanislaus River system. Herrick's Declaration, Exh. B at 46–47, 55–56. A specific program to meet pre-CVPIA obligations first is not part of this plan. *Id.,* Exh. A at 48.

"[T]he USBR acknowledged that on occasion salinity objectives at Vernalis will not be met under its plan." Declarations in Opposition to Plaintiff's Motion for Summary Judgment, Exh. 5. Defendants contend, however, that "[t]he ... yield from New Melones Reservoir alone is not capable of fully meeting the San Joaquin River requirements at Vernalis under certain conditions, even if the entire yield is dedicated to that one purpose .... [T]he Vernalis flow, Vernalis electrical conductivity, and Ripon dissolved oxygen standards can ... be in competition with each other ...." Herrick's Declaration at 2. Based upon this fact, Defendants argue that Plaintiffs misrepresent the origin of the problems associated with the Vernalis Standard. These expert opinions underscore the need for Interior to have broad discretion to manage CVP water resources year in and year out to satisfy the requirements of law and the many competing user demands. Defendants emphasize the fact that there have been no violations of the standard since 1995, when Defendants' operating procedure changed. One of the Plaintiffs admits this fact, but emphasizes that this success has occurred over a "very wet" period. Declarations in Opposition to Plaintiff's Motion for Summary Judgment, Exh. 2 at 62–63; 75–76.

It is undisputed that in short water years, Interior may have limited ability to meet all its obligations for reasons beyond human control. For this reason, CVP water service contracts have water shortage safety valve provisions and 3406(b)(2) has a supply reduction provision. *See* 3406(b)(2)(C). From this it does not follow that alleged difficulty in meeting carryover storage requirements preclude Defen-

dants from satisfying pre-CVPIA obligations. Herrick's Declaration, Exh. A at 54, 74, 85. Although it might be easier for the Bureau to meet its obligations were it not to make (b)(2) releases, "[t]he USBR historically has met its responsibility for salinity control in the Delta ...." *Id.,* Exh. B at 67–68. The Bureau continuously modifies its accounting and forecasting to meet salinity standards even under adverse supply conditions. Declarations in Opposition to Plaintiff's Motion for Summary Judgment, Exh. 14 at 73–74; Exh. 15 at 51. Flexibility is essential for the Bureau to work closely with the SDWA to ensure water is released at the most beneficial times. *Id.,* Exh. 1.

### 3. *Water Rights*

"Riparian right holders cannot require that water stored in another season be released for their benefit. Water stored in another season is not natural flow of the stream." Defendants Supporting Declarations, Exh. 5 at 97. USBR will meet its objectives but should be able to "choose to meet the objectives by ... means" other than those dictated by the Plaintiffs. *Id.,* Exh. 9 at 123. Defendants demonstrate that Plaintiffs' conclusions are premised on erroneous interpretations of studies and models:

SDWA pointed out fifty-one instances in SJRGA's modeling studies in which SDWA argued that water quality at Vernalis would be impaired as a result of the petitioned changes .... Forty-four of these instances, however, were attributable to rounding errors in the modeling studies. In these instances, the flows at Vernalis were the same with and without the petitioned changes .... The seven remaining instances corresponded to hydrological responses to the petitioned changes. In all seven instances, however, the Vernalis salinity objective was met .... Accordingly, the

modeling shows no injury to the southern Delta beneficial uses of water. *Id.*, Exh. 9 at 123:18. Defendants' scientific expertise and experience prove that deference to Interior does not impede the satisfaction of the Vernalis Standard, which has not been violated. Deference to Interior provides the flexibility to meet the standard through various means, whose choice varies with ever-changing hydrologic, weather, and land use conditions. Plaintiffs have presented no evidence from which it can be determined as a matter of law that Defendants' Interim Plan violates the CVPIA. Plaintiffs' motion for summary judgment must be DENIED.

### 4. *Alleged Injuries to Plaintiffs*

Assuming, *arguendo,* that Defendants have discretion to choose the means by which to distribute CVP water to meet all state and federal requirements applicable to the CVP, Plaintiffs contend that Defendants actions are a *per se* violation of the CVPIA, because the Bureau's "(b)(3) purchases of tributary flows that would otherwise flow in the San Joaquin River do create a need for additional releases of water from New Melones, and sometimes worsen water quality." Plaintiffs' Reply at 5:9–12. Defendants' "acquisition of (b)(3) water will increase the number of exceedences of the Vernalis Water Quality Standard[,] . . . are contrary to the express direction in 3406(b)[,]" and also allegedly constitute a present injury to Plaintiffs. Plaintiffs' Motion at 9:4–8. Plaintiffs contend that such releases lower release flows to the river and raise salinity at certain times of the year, effecting injuries to Plaintiffs. No scientific data or expert opinion supports this argument.

As evidence they have suffered injury, Plaintiffs rely upon the Ninth Circuit's interlocutory ruling in this case, which decided standing and discussed "threatened," not real or actual injury. The Ninth Circuit concluded that "[t]he threat of injury resulting from the Bureau's employing an operational plan that will likely lead to violations of the Vernalis Standard is sufficient to confer standing on [P]laintiffs." *Central Delta Water,* 306 F.3d at 948 (finding Plaintiffs had standing and overturning summary judgment for Defendants). The holding was limited to "the necessary showing for standing purposes . . . [which is] that Plaintiffs face significant risk [of injury] . . . ." *Id.* This ruling did not find any injury in fact has been suffered. The ruling speculates about threatened injury and declined to accept Interior's promise that it would take any future measures necessary to assure compliance with the Vernalis Standard.

Plaintiffs argue that their motion for summary judgment should be granted because Defendants' alleged failure to honor pre-CVPIA obligations constitutes a present violation of 3406(b)(2), and the Bureau's (b)(3) purchases will lead to certain future violation of the Vernalis Standard. Plaintiffs' Motion at 8:1–9:8; *see also* Plaintiffs' Reply at 3:21–6:5. Plaintiffs argue for the first time in their reply that Federal Defendants' "plan is that it will not satisfy the Vernalis Standard," which the Ninth Circuit rejected in *Central Delta Water Agency, Id.* at 948.[9] Plaintiffs' Reply at 2:2–20.

The Ninth Circuit, however, found in *Central Delta* "that a credible threat of harm is sufficient to constitute actual inju-

---

9. In their Motion for Summary Judgment, Plaintiffs rely exclusively on the Ninth Circuit's speculation about the imminency and actuality of future injury in *Central Delta,* a decision solely focused on the question of standing. Plaintiffs argue as if the case has

been decided on the merits. Their reply relies primarily upon *Central Delta,* citing one state court case (*Ball v. Posey,* 176 Cal.App.3d 1209, 222 Cal.Rptr. 746 (1986)) and a previous "court decision."

ry for standing purposes, whether or not a statutory violation has occurred," not that the statute was violated or that injury had in fact occurred. *Central Delta*, 306 F.3d at 950. The Ninth Circuit observed that although Federal Defendants "may adopt some other operational plan in the future that would prevent the violation of the Vernalis Standard in a dry year[, they] "offer[ ] no specific or concrete plan of action for doing so." " *Id.* The Appeals Court found a threat of harm was disclosed by "the Bureau's own modeling [which] concludes that the Vernalis Standard will be violated during 16% of the months that comprise the Plaintiffs' growing season" [and] cannot be overcome simply by the Bureau's "unsupported protestations that it does not intend to violate the standard." *Id.*

The Court of Appeals had no evidence of any actual violation of the statute. The Court refused to accept Interior's undertaking that it would act to prevent future hypothetical violations of the Vernalis Standard although the CVPIA leaves to Interior's expertise and experience the implementation of statutory duties in its field of competence in federal water project management. That Court did not find that Plaintiffs had suffered, or with reasonable certainty, would suffer injury. Instead, the Appeals Court found that the threat of excess demand over CVP water supply described by Defendants, coupled with the absence of a finite plan to address future shortages, was sufficient to create standing in the Plaintiffs. This speculative potential injury, which assumes Interior will intentionally violate the law by not acting to meet its legal duties under the CVPIA, without any evidence that Interior has permitted the Vernalis Standard to be violated, does not prove that Defendants have violated, are violating, or "will violate the Vernalis Standard." Plaintiff's Reply at 3:10–11. Plaintiffs incorrectly seek to extrapolate the Ninth Circuit's opinion, to establish, without any evidence, an actual violation of the Vernalis Standard.

Plaintiffs have provided no tangible evidence or expert opinion that they have been injured, are being injured, or will be injured by an actual or imminent future violation of the Vernalis Standard. Numerous witnesses for the Plaintiffs were deposed, none could provide any specific, tangible proof that Defendants had failed since 1995 to meet the Vernalis Standard; that they suffered injury to their land (e.g., salt build up in soil); or that any specific acquisition of water under (b)(3) has caused them identifiable harm. *See e.g.,* Defendants Declarations in Opposition, Exh. 2 at 104; Exh. 3 at 18 and 35–57; Exh. 4 at 58; Exhs. 5–11.

Plaintiffs also advance hypothetical possibilities of what may happen in the future, for which they provide no evidence. Plaintiffs' counsel, for example, although admitting that the releases were not injurious for the 1999 water year, claimed that current release levels would cause *"future injury"* by preventing the Bureau from maintaining storage to respond to *future* droughts. Defendants' Declarations in Support, Exh. 4. (Emphasis added.) Plaintiffs asserted that damages from Defendants' policies are so incremental that they cannot be measured and no single cause can be identified. Defendants' Declarations in Support, Exh. 5. Plaintiffs, however, submitted no evidence to support this theory of hypothetical future harm.

The Ninth Circuit's interlocutory ruling on a pleading motion addressed to standing did not hold as a matter of law that Plaintiffs had suffered actual injury. There is no such law of the case. After almost five years of litigation, Plaintiffs have no evidence that they have suffered any actual injury. Plaintiffs' Motion for Summary Judgment is DENIED.

B. *Defendants' Motion for Summary Judgment*

1. *Plaintiffs' Motion for Summary Judgment is a Collateral Attack on the Previous Decisions of the SWRCB and this Court*

Defendants allege that Plaintiffs claims should be barred as "collateral attacks on the findings of the SWRCB" because "the SWRCB has retained jurisdiction over Reclamation's meeting the water quality standard at Vernalis." Defendants' Opposition at 18:16–17, 4–5. Defendants fail to identify which decision Plaintiffs seek to collaterally overturn. Defendants advise that SWRCB is working with the Bureau on an ongoing basis to meet the 1995 objectives for the Vernalis standard. Defendants' Motion 20:10–16. No plan or model has been finalized. *Id.*

 Defendants also claim Plaintiffs implicitly challenge "Interior's calculation of CVP yield." Defendants' Opposition at 18:27–19:1. This presents the issue of whether Plaintiffs' claims were raised in the accounting litigation. Interior's Final Decision that produced the accounting rule was the final product of valid notice and comment rulemaking. Water users, environmentalists, and others filed a formal legal challenge in the District Court seeking judicial review of this rule. Any potential claimant was given opportunity to intervene in the accounting case. Plaintiffs did not do so. They should not now be heard to complain about the prior Final (b)(2) Accounting Rule promulgated by Interior and affirmed in all material respects by a final decision of the Court of Appeals in *Bay Institute*. Plaintiffs claims, to the extent they challenge or seek to overturn the Bureau's Final Rule re (b)(2) Accounting, are barred because they had an opportunity to intervene in validly conducted notice and comment rulemaking, did not, and their interests were represented by similarly situated water users on all the

issues there decided. As to the validity of the application of Interior accounting rule for CVPIA yield, and related decisions, Defendants' motion for summary judgment is GRANTED. To the extent that the Court of Appeals in *Central Delta* held that prior judicial proceedings did not specifically address the New Melones Unit, the motion is DENIED.

2. *Abstention*

Federal Defendants argue that as "the SWRCB has already taken actions directing Reclamation to do precisely what the panel members indicated this Court should do. As such, this Court should abstain." Defendants' Motion at 21:25–27. The SWRCB, therefore, has proper jurisdiction over the regulation of this issue and the SWRCB, not this court, should issue Plaintiffs' a remedy, if one is needed. *Id.* at 24–31.

Plaintiffs oppose this motion arguing that (1) the Ninth Circuit's ruling in *Central Delta* is "the law of this case, and should govern all further proceedings," (2) abstention is not a proper response for this court, (3) this court can properly fashion a remedy, and (4) the Plaintiffs' water rights are well established. Plaintiffs' Opposition at 2:12. Abstention, Plaintiffs argue, is inappropriate because "there simply is no ongoing proceeding or order of any state administrative agency involving the enforcement of the CVPIA" and there can be no disruption of state efforts in the present case. *Id.* at 4:24–25, 5:16. The Ninth Circuit, in discussing the second standing requirement, suggested, "a court order could remedy any resulting injury to [P]laintiffs by ordering the Bureau to select different means to comply with the Act, so that the proper salinity levels in the Stanislaus River are maintained." *Central Delta*, 306 F.3d at 947. Plaintiffs argue that this ruling makes a court reme-

dy appropriate. Plaintiffs' Opposition at 6:10–7:3.

Defendants reply that this court should abstain, as it has in the *Stockton East case,* [*Stockton East Water District, et al., v. United States, et al.,* Case No. CIV–F–93–5896 OWW, Doc. 341, filed April 23, 1999], and defer to state regulation as Plaintiffs are currently participating in ongoing state proceedings involving the issues of alleged violation of the Bureau's SWRCB licenses and permits, also presented in this case, all of which concern a federal reclamation statute that defers to all not-inconsistent state law obligations, as promulgated by the SWRCB. Defendants' Reply at 2:19–5:15. Defendants contend that they have not violated "the salinity standard since 1995, the year before the water transfers under (b)(3) began" (emphasis omitted); that Plaintiffs misstate "the modeling performed by Reclamation;" and that if "water quality were given the number one priority among the obligations imposed on Reclamation ... 'fishery flows would be less than the minimum in 16 of 71 years and would be zero in 5 of 71 years.'" *Id.* at 5:18–7:10.

Defendants further assert that Plaintiffs have no "entitlement to the water in New Melones ... [and] are entitled only to the natural flow of the stream." *Id.* at 8:5–6. "Since Plaintiffs have no rights to the water in New Melones, either water storage or carry over, how Reclamation meets the water quality objectives is of no moment to the Plaintiffs." *Id.* at 9:14–16. "Under State law, Plaintiffs cannot make any demand for releases from storage since they have no property right in such water .... Plaintiffs cannot dictate how Reclamation meets its various obligations under State law ...." *Id.* at 11:7–11. Defendants acknowledge that "the Ninth Circuit decision is the law of this case ... [i]n assessing the issues of ripeness and standing." *Id.* at 11:20–23. As the Ninth Circuit "made no

factual findings that bind this Court, the panel [was] merely speculating as to the case's possible outcome[,]" its motion for summary judgment should be granted. *Id.* at 11:22–12:2. Moreover, the SWRCB has now spoken in a recent pronouncement again finding Plaintiffs have no rights to New Melones CVP waters.

██ A three-fold *"Younger"* test is applied to determine whether federal intervention in state judicial proceedings warrants a federal court's refusal to hear a case otherwise within its jurisdiction:

(1) Are there ongoing state judicial proceedings?

(2) Second, do the proceedings implicate important state interests?

(3) Third, is there an adequate opportunity in the state proceedings to raise constitutional challenges?

*Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (found that the administrative proceedings were "judicial in nature" from the outset); *Fresh Int'l Corp. v. Agric. Labor Relations Bd.,* 805 F.2d 1353 (9th Cir.1986) (finding that abstention may be warranted if there is an adequate opportunity in the state proceeding to raise a federal question); *see also Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Abstention is appropriate in favor of a state proceeding if these three conditions are present.

██ Although *Younger* abstention requires an ongoing state proceeding, it operates when that state proceeding is pending prior to the federal proceeding. "Whether the state proceedings are 'pending' is not determined by comparing the commencement dates of the federal and state proceedings." *Polykoff v. Collins,* 816 F.2d 1326, 1332 (9th Cir.1987). Rather, *"Younger* abstention is required ...

when state court proceedings are initiated 'before any proceedings of substance on the merits have taken place in the federal court.'" *Haw. Hous. Auth. v. Midkiff,* 467 U.S. 229, 238, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (citing *Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975)); *Fresh Int'l,* 805 F.2d at 1358; *see also Martori Bros. Distributors v. James–Massengale,* 781 F.2d 1349, 1354 (9th Cir.1986) (finding "[a]bstention will not be required unless the 'state court proceedings [have been] initiated before any proceedings of substance on the merits have taken place in the federal court'"). A federal proceeding may be deemed to have passed beyond the "'embryonic stage'" if the federal court has conducted extensive hearings on a motion for a preliminary injunction. *Adultworld Bookstore v. City of Fresno,* 758 F.2d 1348, 1350–52 (9th Cir.1985) (finding the district court erred by abstaining and reviewing because the district court had held an "extended evidentiary hearing on the question of a preliminary injunction" and all of the evidence presented below and the district court's statements were before the appellate court).

■■■ Here, although some matters are pending before the SWRCB, Defendants have not provided evidence that the pending state proceeding involves the priority of pre-CVPIA over CVPIA obligations, as asserted by Plaintiffs, particularly as they affect implementation of §§ (b)(2) and (b)(3). Extensive summary judgment proceeding on cross-motions has occurred, after a Ninth Circuit interlocutory ruling on the Plaintiffs' standing in resolving 12(b)(6) motions. There is no indication the pending state proceedings have addressed the CVPIA issues presented in this case, except for Plaintiffs' alleged water rights. Defendants do not meet the first part of the *Younger* test.

■■■ *Younger* abstention is appropriate only if the federal action would affect important state interests that are "'vital to the operation of state government.'" *Polykoff v. Collins,* 816 F.2d 1326 (9th Cir.1987) (citations omitted). "Although *Younger* itself involved a threatened injunction of a pending state criminal proceeding, the concerns for comity and federalism underlying *Younger* are 'equally applicable to certain other pending state proceedings' in which important state interests are involved." *Id.* (citing *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,* 477 U.S. 619, 627–29, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986)). "Abstention in such cases is appropriate, however, only when 'the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government.'" *Id.* (quoting *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1–2, 11, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987)).

In this case, Defendants identify the state SWRCB proceedings whose existence they claim is "undisputed," but do suggest that an important state interest that is not correlative to federal interests would be interrupted or interfered with by this case. Defendants' Motion at 23.12. Even if there were, it is not clear that the extent to which federal interests are presented or protected as interpretation of the scope of the CVPIA is not the main focus of the state proceeding. The second requirement of the *Younger* test is arguably not met.

■■■ "[F]ederal courts have an interest in the orderly functioning of the federal judicial system and in the preservation and exercise of their jurisdiction." *Polykoff v. Collins,* 816 F.2d 1326, 1333 (9th Cir.1987). "'Principles of comity and federalism do not require that a federal court abandon jurisdiction it has properly acquired simply

because a similar suit is later filed in a state court.'" *Id.* (citing *Town of Lockport v. Citizens for Community Action at the Local Level, Inc.,* 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977)); *see also Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 510, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972)(stating that federal courts may not escape from their duty to exercise federal jurisdiction " 'merely because state courts also have the solemn responsibility'" of protecting federal constitutional rights) (quoting *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)).

In this case, Plaintiffs' claims concern a federal statute, the CVPIA, whose meaning and scope is properly the domain of the federal courts. The Federal Defendants have expressly invoked their right not to litigate these issues in State Court. The administrative proceedings in the state court concern interpretation of the SWRCB permits that Plaintiffs claim are being violated. Defendants do not establish the third requirement of the *Younger* test. Finally, the *Stockton East* case is not analogous. There, all parties agreed to the stay to defer to pending SWRCB proceedings.

The Defendants do not meet the three *Younger* requirements. Defendants' motion for summary judgment on the basis of abstention is DENIED.[10]

### 3. *Plaintiffs Lack Water Rights to Require CVP Water Releases*

In D–1641 (1999) (1999 WL 1494883), the SWRCB addresses the question of riparian rights:

Assuming that any water right holders downstream of the parties supplying water under the SJRA have senior riparian water rights, such water right holders could require the SJRA suppliers of water to bypass water from natural flow. They could require this with, or in the absence of, the petitioned changes. Riparian right holders cannot, however, require that water stored in another season be released for their benefit. Water stored in another season is not natural flow of the stream. Riparian rights attach only to the natural flow of a stream .... Further, riparian rights do not attach to water that has been stored upstream during an earlier period .... Thus, if water previously stored in another season is flowing in the stream, that water is not available to riparian right holders. It follows that if previously stored water is not available to a riparian right holder, the riparian right holder cannot be injured if the water does not arrive at the riparian right holder's point of diversion due to a change in the use of the stored water. If an upstream diverter increases its use of natural flow or detains the water as a result of a change in its water right so that it does not reach the downstream riparian right holder at the natural time, however, and this change deprives the downstream riparian right holder of adequate water for beneficial uses, the downstream riparian right holder could be injured by the change ....

Plaintiffs can only claim injuries arising from their "rights to the natural flow of [the] stream." They have no riparian rights "to water that has been stored upstream during an earlier period" or "water stored in another season" and cannot be injured "due to a change in the use of the stored water." They can, though, be injured "[i]f an upstream diverter increases its use of natural flow or detains the water

---

10. Defendants cite *U.S. v. Braren,* 338 F.3d 971, 974–76 (9th Cir.2003) as authority, it is not clear how the ripeness question the Ninth Circuit discusses there pertains to the doctrine of abstention here.

... [so that] the downstream riparian right holder could be injured by the change."

■ In this case, as Plaintiffs have only alleged riparian rights to the natural flow, the issue is whether Plaintiffs' evidence concerns natural stream flows or stored water. The Bureau operates the New Melones Unit, which consists of the New Melones Dam and the New Melones Reservoir, pursuant to federal reclamation statutes and under four California water rights permits numbered 16597–16600, which were issued by the Board in water rights decisions 1422 ("D–1422"), rendered in April 1973. The permits allow for various uses of the water stored in the reservoir. D–1422 authorizes the Bureau to release certain amounts of water from the Reservoir to maintain local fishery populations so long:

as the salinity concentrations as measured downstream remain no greater than 500 parts-per-million (ppm). Plaintiffs contend that the less water the Bureau release into that River, the higher the salinity level downstream at Vernalis, which is closer to the ocean. According to the Plaintiffs, water that exceeds the Vernalis salinity standard-that is, water that measures in excess of 500 ppm at Vernalis-has a significant negative effect on certain types of crops, and thus the Bureau's compliance with the standard determines what kind of crops they are able to grow.

Plaintiffs' "riparian" rights claims have been asserted before the State Water Board and rejected. They have not shown that their riparian rights entitle them to New Melones stored CVP water or to any other water Defendants manage in their CVP operations.

The three subsections of CVPIA § 3406(b) all relate to requirements that the Project divert water so as to increase water supply in fishery areas to enhance the habitats of various aquatic life forms. Soon after the passage of the Act, the Bureau adjusted its operations to comply with these statutory directives. The Bureau began diverting CVP yield for use in fish doubling and habitat improvement that might otherwise, but would not necessarily have been released from the New Melones Reservoir into the Stanislaus and San Joaquin Rivers. Nothing in the Act requires the Bureau to take water from the New Melones Reservoir, as opposed to other Central Valley Project reservoirs, in order to comply with the fish habitat restoration requirements of § 3406(b). Nevertheless, as part of its efforts to meet those requirements, the Bureau has exercised its management discretion to divert water from the New Melones Reservoir.

The only water at issue in this case is stored water from the New Melones Reservoir. Plaintiffs present no contrary evidence. Because it is not natural stream flow water, Plaintiffs have no riparian rights to such water, or to direct or control its flow or to require its storage. Defendants need only satisfy the Vernalis Standard; they do not need to provide any specific source of water to do so or to reserve water for that purpose. Plaintiffs do not demonstrate through evidence, or case law, that they have riparian rights in the New Melones Reservoir or its stored waters. Plaintiffs' Opposition at 7:5–8:16. Defendants' motion for Summary Judgment as to Plaintiffs' alleged state water rights claims to New Melones Reservoir waters is GRANTED.

4. *There is No Indication that Plaintiffs Have Suffered, or Will Suffer, Injury in Fact*

The question of whether the Plaintiffs have suffered injury is a factual one. Although the Ninth Circuit found that Defendants' conduct could "potentially" (hy-

pothetically) injure Plaintiffs, Plaintiffs have themselves provided no evidence that they have been injured, are being injured, or will actually, within reasonable scientific certainty, be injured. To the contrary, all the evidence submitted shows that Interior historically has acted to obtain additional water supplies or altered CVP management prescriptions to meet CVPIA and other federal and state legal requirements that govern the CVP when necessary to comply with applicable law. Numerous witnesses for the Plaintiffs were deposed. None could provide any specific evidence that Defendants have failed to meet the Vernalis Standard since 1995; that they have suffered injury to their land (e.g., salt build up in soil); or that any specific acquisition of water under (b)(3) has caused identifiable harm. *See e.g.,* Defendants Declarations in Opposition, Exh. 2 at 104; Exh. 3, 18, 35–57; Exh. 4, 58; Exhs. 5–11. Plaintiffs' witnesses freely admitted that they had not, to this point, suffered any injury. *Id.*

Defendants assert by declaration: "SDWA pointed out fifty-one instances in SJRGA's modeling studies in which SDWA argued that water quality at Vernalis [']would be['] impaired as a result of the petitioned changes .... Forty-four of these instances, however, were attributable to rounding errors in the modeling studies. In these instances, the flows at Vernalis were the same with and without the petitioned changes .... The seven remaining instances corresponded to hydrological responses to the petitioned changes. In each of the seven instances, however, the Vernalis salinity objective was met .... Accordingly, the modeling shows no injury to the southern Delta beneficial uses of water." Defendants Declarations in Support, Exh. 9 at 123:18. Plaintiffs make no effort by competent scientific evidence or opinion to refute Defendants' evidence.

Plaintiffs are only required to create a disputed issue of material fact as to the cause of any alleged injury in order to survive summary judgment. Plaintiffs, however, in four years have provided no evidence whatsoever that creates such a question. In contrast, Plaintiffs candidly admit that they have no evidence of present injuries or of the hypothetical future injuries they allege might occur in the unlikely event that Interior abdicates its statutory duties. Defendants have provided substantial unrebutted evidence to demonstrate Plaintiffs have not suffered any injury, including the admissions of some of the Plaintiffs. Defendants' motion for summary judgment is GRANTED.

## VII. *CONCLUSION*

Plaintiffs, after five years of litigation, have no evidence that Interior has violated or imminently threatens to violate the Vernalis Standard. In this lawsuit, they have failed to prove actual injury. The law does not favor advisory opinions about speculative future injury. For all these reasons:

1. Plaintiffs' Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56 is DENIED;

2. Defendants' Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56 is GRANTED.

3. Defendants shall submit an appropriate form of judgment in conformity with this Decision within five (5) days following the date of service of this Decision.

SO ORDERED.

## JUDGMENT GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 58, the Court, having considered the pleadings and evi-

dence filed by Plaintiffs, Central Delta Water Agency, South Delta Water Agency, Alexander Hildebrand and R.C. Farms; Federal Defendants, United States of America, et al., and Defendant Intervenors, San Joaquin River Group Authority, .et al.; further, having considered oral arguments presented by the parties, hereby adjudicates as follows the claim of Plaintiffs that Federal Defendants have violated certain terms and provisions of the Central Valley Project Improvement Act, Pub.L. 102–575, 106 Stat. 4600 (CVPIA), and that such alleged violations could result in the violation of the Vernalis Water Quality Standard allegedly causing harm and injury to Plaintiffs:

1. The Bureau of Reclamation ("Reclamation"), in its operations of the Central Valley Project ("CVP"), California, has consistently met the Vernalis Salinity Standard since 1994, a requirement under the Federal Clean Water Act, 33 U.S.C. § 1251 et seq., which is implemented by the State of California. The Standard was most recently set forth in the 1995 Water Quality Control Plan.

2. While Interior must meet the Vernalis Standard, how that obligation is met is within Interior's discretion.

3. The management of the CVP, the largest reclamation project in the United States, and the implementation of the CVPIA are expressly delegated by law to the Department of the Interior ("Interior").

4. Section 3406(b)(2) of the CVPIA contains two provisions, one referring to how "CVP yield" is to be calculated and, second, how CVP yield is to be allocated. The former was litigated and decided in *San Luis & Delta–Mendota Water Authority v. United States*, CIV–F–97–6140 OWW, affirmed by the Court of Appeals.

5. Plaintiffs, having been provided opportunity, failed to join in the legal challenge in this Court in *San Luis & Delta–Mendota Water Authority v. Interior*, as to Interior's calculation of CVP "yield" under the CVPIA, are barred from challenging Interior's determination.

6. As to the allocation of CVP yield, the CVPIA leaves to Interior's broad discretion and expertise the implementation of § 3406(b)(2) of the CVPIA under which Interior must dedicate and manage 800,000 acre feet of CVP "yield" for fish, wildlife and habitat restoration purposes.

7. Deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is warranted with regard to Interior's implementation of § 3406(b)(2).

8. Riparians do not have a right to require the release for riparians' benefit of water stored from a previous season. Plaintiffs have presented no evidence that they have riparian rights in the water stored in New Melones Reservoir. Defendants' motion for summary judgment as to Plaintiffs' alleged state water rights claims is GRANTED.

9. The decision of the Ninth Circuit Court of Appeals in this case, reported at 306 F.3d 938 (9th Cir.2002), which found that Plaintiffs had standing, did not find a violation of law by the Federal Defendants.

10. Federal Defendants' allegation that Plaintiffs' claims are barred as "collateral attacks on the findings of the SWRCB" is DENIED.

11. The Federal Defendants' motion that the Court abstain is DENIED based on not meeting the three standards under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

12. Plaintiffs have failed to provide evidence that Reclamation's management of the CVP has caused them any harm or will cause them harm in the future. All the evidence presented demonstrated that In-

terior has acted to obtain additional supplies of water in order to meet its obligations under both Federal and State law that govern the management of the CVP. Since Defendants have presented substantial unrebutted evidence to demonstrate Plaintiffs have suffered no injury, Defendants' motion for summary judgment is GRANTED.

13. The law does not favor advisory opinions as to speculative future injury. As such, given the evidence presented, Plaintiffs' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is DENIED and Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is GRANTED.

JUDGMENT IS ENTERED FOR THE FEDERAL DEFENDANTS AND DEFENDANT INTERVENORS, AND AGAINST PLAINTIFFS.